**RICHMOND MEDICAL CENTER FOR WOMEN, et al., Plaintiffs,**

v.

**David M. HICKS, et al., Defendants.**

**No. CIV.A.03CV531.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 2, 2004.

Susan Ann Kessler, Blackburn Conte Schilling & Click PC, Richmond, VA, Suzanne Novak, Priscilla Smith, Nan E. Strauss, New York City, for plaintiffs.

James Christian Stuchell, Siran S. Faulders, Office of the Attorney General, Edward Meade Macon, Assistant Attorney General, Edward Joseph McNelis, III, Rawls & McNelis PC, Richmond, VA, for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on the plaintiffs' motion for summary judgment. Also pending are plaintiffs' motions to strike (1) selected portions of Dr. Giles' sworn testimony; (2) selected portions of Dr. Seeds' sworn testimony; and (3) exhibits and other documents. The defendants have responded, the plaintiffs have filed replies, the Court has heard oral argument, and this matter is ripe for adjudication.

### I. FACTS

The Court finds that the following facts are undisputed by evidence in the record.

*Statutory Provisions*

1. Chapters 961 and 963 of the 2003 Acts of the Virginia General Assembly, codified at Va.Code Ann. § 18.2–71.1 ("the Act"), make it a Class 4 felony for a person to knowingly perform "partial birth infanticide."

2. In Virginia, a Class 4 felony carries a prison term of up to ten years, and a fine of up to $100,000. Va.Code Ann. § 18.2–10.

3. The Act defines "partial birth infanticide" to mean:

any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.

Va.Code Ann. § 18.2–71.1(B).

4. The Act provides the following list of exceptions from that definition:

The term "partial birth infanticide" shall not under any circumstances be construed to include any of the following procedures: (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother, or (iv) completing delivery of a living human infant and severing the

umbilical cord of any infant who has been completely delivered.

Va.Code Ann. § 18.2–71.1(B).

5. The Act defines the phrase "human infant who has been born alive" as follows:

"human infant who has been born alive" means a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

Va.Code Ann. § 18.2–71.1(C).

6. The Act defines the phrase "substantially expelled or extracted from its mother" as follows:

in the case of a headfirst presentation, the infant's entire head is outside the body of the mother, or, in the case of breech presentation, any part of the infant's trunk past the navel is outside the body of the mother.

Va.Code Ann. § 18.2–71.1(D).

7. Subsection E of the Act provides a limited exception for the life of the woman:

This section shall not prohibit the use by a physician of any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant. A procedure shall not be deemed necessary to prevent the death of the mother if completing the delivery of the living infant would prevent the death of the mother.

Va.Code Ann. § 18.2–71.1(E).

8. The Act contains no exception to its prohibition of steps taken to complete an abortion or other medical procedure "where it is necessary, in appropriate medical judgment for the preservation of the . . . health of the mother." *Stenberg v. Carhart*, 530 U.S. 914, 931, 937, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); Va.Code Ann. § 18.2–71.1.

9. The Virginia General Assembly rejected amendments to the Act that would have provided an exception for some circumstances when the woman's health was at risk. *See* H.B. 1541, Governor's recommendation, received by House 3/24/03, rejected 4/02/03, 2003 Sess. (Va.2003); S.B. 1205, Governor's recommendation, received by Senate 3/24/03, rejected 4/02/03, 2003 Sess. (Va.2003) (Appendix to plaintiffs' motion for summary judgment, Tabs 4 & 5 ("Pls' App. Tab __")).

10. The Act applies throughout pregnancy, regardless of the gestational age or viability of the fetus. Va.Code Ann. § 18.2–71.1

11. The Virginia House of Delegates rejected amendments offered to limit the Act's abortion ban to post-viability abortions. *See* H.B. 1541, Amendments 1 and 2 by Del. Ioannou, rejected by House 1/31/03, 2003 Sess. (Va.2003) (Pls' App. Tab 5).

*The Applicable Medical Practices*

12. Plaintiff Richmond Medical Center ("RMCW") is located in Richmond and also operates a facility in Roanoke and in Newport News. These facilities provide a variety of reproductive health services and gynecological and obstetrical medical services including evacuating the products of conception for women who have had miscarriages and are in need of such assistance. (Fitzhugh Decl. ¶ 10 (Pls' App. Tab 6).) *See also* 8/22/03 Order, Findings of Fact ("FF") ¶ 10.

13. Plaintiff Dr. William G. Fitzhugh is board-certified in obstetrics and gynecology and is licensed to practice medicine in

Virginia. (Fitzhugh Decl. ¶ 1.) Dr. Fitzhugh is and has been the Medical Director of RMCW for more than 25 years. He also has a private practice in obstetrics and gynecology. (Fitzhugh Decl. ¶ 9.) He is also a clinical instructor in the Department of Obstetrics and Gynecology at Virginia Commonwealth University's Medical College of Virginia, located in Richmond, where he provides clinical training to medical students and residents. (*Id.*)

14. Dr. Fitzhugh performs abortions and treats women who are experiencing incomplete miscarriages at RMCW and at hospitals in the City of Richmond and the County of Henrico. Dr. Fitzhugh's patients come from all parts of Virginia, and some patients come from out of state. (Fitzhugh Decl. ¶¶ 10, 13;) 8/22/03 Order, FF ¶ 11.

15. In some of the cases of women experiencing incomplete miscarriages, the fetus is positioned in the woman's vagina and may show signs of life. Because the umbilical cord of a first and early second-trimester fetus is very short, the safest and most medically appropriate way to complete such a miscarriage is to separate the umbilical cord in order to remove the fetus. (Fitzhugh Decl. ¶ 29.)

16. With respect to his abortion practice at RMCW, Dr. Fitzhugh provides abortions up to thirteen (13) weeks as measured from the first day of the woman's last menstrual period ("lmp"). (Fitzhugh Decl.¶ 10.) He provides abortions through twenty (20) weeks lmp at hospitals within the City of Richmond and at a hospital in the County of Henrico. (*Id.*)

17. The most common abortion method is the suction curettage or suction aspiration method, in which the physician dilates the woman's cervix, inserts a tube (cannula) through the woman's vagina and into her uterus, and suctions the embryo or fetus and other products of conception through the woman's cervix and vagina.

(Fitzhugh Decl. ¶ 15; deProsse Decl. ¶ 20 (Pls' App. Tab 7).) *See also* 8/22/03 Order, FF ¶ 12. This method is generally used prior to 14 weeks lmp. (*Id.*)

18. The Act excludes the suction curettage and suction aspiration procedures from criminal liability. Va.Code Ann. § 18.2–71.1.

19. After approximately 14 weeks, the fetus is generally too large to remove by suction alone. (Fitzhugh Decl. ¶ 17; deProsse Decl. ¶ 21.) *See also* 8/22/03 Order, FF ¶ 14. Dilation and evacuation ("D & E") is the most common method of pre-viability second-trimester abortion, accounting for approximately 96% of all second-trimester abortions in the United States. (deProsse Decl. ¶ 21.) *See also* 8/22/03 Order, FF ¶ 15; *Carhart*, 530 U.S. at 924, 120 S.Ct. 2597. As this Court has recognized, the D & E procedure "represents a significant advance in second-trimester abortions." *Richmond Med. Ctr. for Women v. Gilmore*, 55 F.Supp.2d 441, 480 (E.D.Va.1999).

20. In *Carhart*, the Supreme Court provided a general description of the D & E method. Generally, that method includes the following steps: "(1) dilation of the cervix; (2) removal of at least some fetal tissue using nonvacuum instruments; and (3) (after the 15th week) the potential need for instrumental disarticulation or dismemberment of the fetus or the collapse of fetal parts to facilitate evacuation from the uterus." 530 U.S. at 925, 120 S.Ct. 2597.

21. The steps taken by a physician performing a D & E are substantially the same today as they were when the Supreme Court decided *Carhart*, striking down a statute similar to the one at issue in this case, and the same as when this Court decided *Richmond Med. Ctr. v. Gilmore*. (Giles Dep. 166:21–24 (Pls' App. Tab 2).)

22. When performing a pre-viability D & E procedure, Dr. Fitzhugh typically dilates the woman's cervix with multiple intracervical osmotic dilators, which not only expand the cervix, but also cause it to change forms so that it will be a softer, more open organ. (Fitzhugh Decl. ¶ 17; *see also* deProsse Decl. ¶ 22.) He then removes the products of conception, including the pre-viable fetus, from the woman's uterus using a combination of suction and forceps. (Fitzhugh Decl. ¶¶ 17, 19; deProsse Decl. ¶ 22; *see also* Giles Dep. at 29:16–23.)

23. In order to remove the fetus during a D & E, Dr. Fitzhugh generally uses a speculum to hold the vagina open and uses a tenaculum to apply traction to the cervix in order to stabilize it. The tenaculum also serves to hold the cervix closer to the vaginal introitus, or opening. (Fitzhugh Decl. ¶ 18; *see also* deProsse Dep. at 57:15–61:17 (Pls' App. Tab 8); Christmas Decl. ¶ 12 (Pls' App. Tab 9).)

24. Depending on the specific woman's body and the use of instrumentation during the D & E, at that point the woman's cervix may be further inside her body than her vagina, resulting in space between her cervical os and the vaginal introitus; it may be pulled down to the point such that the cervical os is in line with the vaginal introitus, such that there is no space between the two; or it may even be further outside the woman's body than the vaginal introitus. (Fitzhugh Dep. at 52–61; Fitzhugh Decl. ¶ 18; *see also* deProsse Decl. ¶ 24; deProsse Dep. at 60:16–61:9; Christmas Decl. ¶ 13; *see also* Seeds Dep. at 95:23–96:14 (Pls' App. Tab 10);) 8/22/03 Order, FF ¶ 18. Dr. Fitzhugh estimates that this situation occurs with one-third of his patients (Fitzhugh Dep. at 52–61); 8/22/03 Order, FF ¶ 28. Such an occurrence is not limited to situations in which the woman has had multiple previous vaginal deliveries or where the physician uses too much force. (Christmas Decl. ¶ 13; Fitzhugh Dep. at 52–61.)

25. Defendants' experts do not regularly have occasion to use a tenaculum either in performing D & E's or in performing any other type of procedure on a patient in the second trimester of pregnancy. (Seeds Dep. at 95:6–22; Giles Dep. at 55:3–57:3.)

26. Defendants' expert Dr. Seeds agrees that the natural distance between the cervical os and the vaginal introitus varies from patient to patient, and in fact, in some women the cervical os and the vaginal introitus are within one or two centimeters of each other. (Seeds Dep. at 95:23–96:14.)

27. To evacuate the uterus in a D & E, Dr. Fitzhugh places a suction tube into the uterus to remove the amniotic fluid. Frequently, the suction will cause part of the fetus, such as an arm, leg, or the umbilical cord, to prolapse (or emerge) out of the uterus and into the vagina or outside the vagina. (Fitzhugh Decl. ¶ 19; deProsse Decl. ¶ 22); 8/22/03 Order, FF ¶ 19. Dr. Fitzhugh will then employ forceps to grasp part of the pre-viable fetus. He will either grasp the part that has prolapsed, or, if none has prolapsed, he will insert the forceps into the uterus and grasp a part there. (Fitzhugh Decl. ¶ 19; *see also* deProsse Decl. ¶ 22). Regardless, he will then pull the forceps towards him. A part of the fetus will be through, or brought through, the cervical os. (Fitzhugh Decl. ¶ 19; *see also* deProsse Decl. ¶ 23.) During the course of all D & E's, all of the products of conception will be drawn or expelled through the cervical os and "outside the body" of the woman. (Fitzhugh Decl. ¶¶ 19, 32–33; deProsse Decl. ¶ 22.) The traction of the fetus against the cervix caused by this pulling usually causes that part of the fetus in the vagina to break off from the rest of the fetus. (Fitzhugh Decl.

¶ 19; deProsse Decl. ¶ 23.) As this Court has recognized, it is not uncommon for the disarticulation during a D & E to occur outside of the uterus, several centimeters outside the external cervical os. (Fitzhugh Decl. ¶ 19; deProsse Decl. ¶ 23; deProsse Dep. at 54:21–55:17; Giles Dep. at 51:11–16.) *See also* 8/22/03 Order, FF ¶¶ 19, 28; *Carhart,* 530 U.S. at 925–26, 120 S.Ct. 2597; *Richmond Med. Ctr.,* 55 F.Supp.2d at 472. Disarticulation in the uterus is more dangerous to the woman because it would require more instrumentation within the uterus and could generate sharp fragments of fetal tissue within the uterus, increasing the risk of internal damage to the patient. (Fitzhugh Decl. ¶ 19; deProsse Decl. ¶ 26.) *See also* 8/22/03 Order, FF ¶ 19; *Richmond Med. Ctr.,* 55 F.Supp.2d at 472.

28. Based on the different possible presentations of the cervix described above, (*supra* ¶¶ 23–24, 26), such dismemberment may occur in the vagina or outside of the vagina. (Fitzhugh Decl. ¶ 19; deProsse Decl. ¶¶ 23–24) At that point, the fetus may show signs of life, such as a heartbeat or a pulsating umbilical cord. (Fitzhugh Decl. ¶ 21; deProsse Decl. ¶ 22.)

29. Sometimes during a D & E, however, Dr. Fitzhugh removes the fetus intact or largely intact. (Fitzhugh Decl. ¶ 20; deProsse Decl. ¶ 25; Giles Dep. at 52:1–8.) *See also* 8/22/03 Order, FF ¶ 20; *Richmond Med. Ctr.,* 55 F.Supp.2d at 453. This can occur when the cervix dilates to a greater extent than he had anticipated. (Fitzhugh Decl. ¶ 20). Again, the pre-viable fetus may show signs of life at that point. (Fitzhugh Decl. ¶ 21; deProsse Decl. ¶¶ 22, 25.)

30. Regardless of whether the fetus remains intact, if the fetal calvarium (skull) is too large to pass through the cervix, Dr. Fitzhugh compresses it in order to complete the procedure in the manner that is safest for the patient. (Fitzhugh Decl.

¶¶ 20, 33; *see* deProsse Decl. ¶¶ 22, 25; deProsse Dep. at 82:6–83:13; Christmas Decl. ¶ 8.) *See also* 8/22/03 Order, FF ¶ 21; *Carhart,* 530 U.S. at 925, 120 S.Ct. 2597 (physicians may need to collapse fetal parts to facilitate evacuation from uterus); (Dep. of Harlan Giles, Apr. 13, 1999, *in Planned Parenthood v. Doyle* ("Giles Dep. (*Doyle*)") at 110:4–22 (testifying that forceps would be his first choice in order to facilitate the removal of a lodged fetal skull of a pre-viable fetus) (Pls' App. Tab 11).)

31. The record demonstrates that intact D & E's have many safety advantages over D & E's involving dismemberment. *See* 8/22/03 Order, FF ¶ 32. In a D & E in which the physician dismembers the fetus, sharp instruments and sharp fetal fragments may damage the woman's uterus. (deProsse Decl. ¶ 26.) When the fetus remains intact during a D & E, the risks of uterine perforation, cervical rupture, infection, and retained fetal tissue are reduced. (Fitzhugh Decl. ¶ 20; deProsse Decl. ¶ 26;) *see also* 8/22/03 Order, FF ¶¶ 19, 20. That is so because the procedure is less invasive; an intact fetus allows the physician to avoid the repeated insertion of sharp instruments into the woman's uterus, and the fetus passes through the birth canal intact. (Fitzhugh Decl. ¶ 20; deProsse Decl. ¶ 26.) *See also Richmond Med. Ctr.,* 55 F.Supp.2d at 453. Moreover, because the procedure takes less time to complete when the fetus comes through the cervix intact, it may also result in less blood loss and less trauma for some patients; and it may have advantages when a physician needs an intact fetus for an autopsy to assess the risk of recurrence of a fetal anomaly. (Fitzhugh Decl. ¶ 20; deProsse Decl. ¶ 26.) It is unadvisable for a physician to try to dismember parts of a fetus after it has come through the woman's cervix largely intact. (deProsse Decl. ¶ 26.) *See also* 8/22/03 Order, FF ¶ 20; *Rich-*

*mond Med. Ctr.*, 55 F.Supp.2d at 454. Such actions would present unnecessary risks to the woman and would provide no benefit. (deProsse Decl. ¶ 26; *see also* Giles Dep. at 50:25–51:1 ("[I]f there is no need for dismemberment, it's pointless to dismember.").)

32. However, in advance of beginning a procedure, neither Dr. Fitzhugh nor other physicians performing D & E's can know whether the fetus will dismember or remain intact, and exactly what operative steps will be necessary to remove a fetus. (Fitzhugh Decl. ¶ 22; Fitzhugh Dep. at 81:21–82:9; 100:3–19; *see also* Giles Dep. at 51:17–22.) Rather, a physician must adapt his or her technique, depending on the individual patient's needs, including the condition of the patient, the amount of dilation, the presentation and size of the fetus, and other medical factors. (Fitzhugh Decl. ¶ 2;) *see also* 8/22/03 Order, FF ¶ 18; (Seeds Dep. at 20:6–13). The exact manner in which Dr. Fitzhugh performs a D & E varies depending on an individual woman's needs and on his own preferences, as informed by his experience, skills and judgments about the woman's health. (Fitzhugh Decl. ¶ 22; *see* deProsse Decl. ¶¶ 24–25, 41, 47, 57.) Defendants' expert Dr. Giles agrees that it is important that Dr. Fitzhugh and other physicians have the flexibility to adjust their surgical techniques based on those factors. (Giles Dep. at 128:5–129:6; *see also* deProsse Decl. ¶¶ 41, 57.)

33. Defendants' expert Dr. Giles has agreed that the manner in which Dr. Fitzhugh performs D & E procedures is medically appropriate. (Giles Dep. at 92:21–94:7; *see also id.* at 84:9–85:6, 85:24–86:5).

34. Substantial medical authority, including testimony from defendants' experts, supports the proposition that banning D & E's, and the manner in which Dr. Fitzhugh performs D & E's, including intact D & E's, could endanger women's

health. (Fitzhugh Decl. ¶¶ 19–20, 22–24, 33; deProsse Decl. ¶ 22–26, 41, 44–46, 50–55, 57; deProsse Dep. at 82:6–83:13; Christmas Decl. ¶ 8; Giles Dep. at 84:9–85:6, 85:24–86:5, 92:21–93:20, 128:15–129:6 (procedure is safe and medically appropriate and flexibility in performing procedure is important for woman's health);) *see also* 8/22/03 Order, FF ¶ 31; *Carhart*, 530 U.S. at 936–37, 120 S.Ct. 2597 (concluding that substantial medical authority, including statements from the American College of Obstetricians and Gynecologists, supports proposition that banning intact D & E's would endanger women's health such that Constitution would require ban on such procedures to contain a health exception); *Richmond Med. Ctr.*, 55 F.Supp.2d at 453–54.

35. Certain circumstances during a D & E may endanger the woman's health, but not necessarily her life. (Trial Testimony of Harlan Giles, May 7, 1997, in *Evans v. Kelley* ("Giles Trial Test. (*Evans*)") at 146:19–23 (Pls' App. Tab 12).)

36. There is a variation of the D & E method called "D & X" (dilation and extraction), where the fetus is removed largely intact, after the physician intentionally converts the fetus to a breech presentation. *Carhart*, 530 U.S. at 928, 120 S.Ct. 2597. "Intact D & E's" and "D & X's" are similar. *Id.* (finding it appropriate to use terms "intact D & E" and "D & X" interchangeably).

37. Besides D & E's, induction is the only other commonly used second-trimester abortion method, accounting for less than 4% of second-trimester abortions nationwide. (deProsse Decl. ¶¶ 21, 27;) *see also* 8/22/03 Order, FF ¶ 15; *Carhart*, 530 U.S. at 924, 120 S.Ct. 2597.

38. Induction is essentially a medically induced, pre-term labor in which the woman has contractions and eventually, after

12 to 30 hours, expels the pre-viable fetus. (deProsse Decl. ¶¶ 27, 50.)

39. Some inductions require a separate, additional procedure, usually dilation and curettage, to complete the removal of the products of conception. (deProsse Decl. ¶ 50.) Further, when an induction is unsuccessful or incomplete, the patient may also require a D & E in order to complete the procedure. (deProsse Decl. ¶ 9;) 8/22/03 Order, FF ¶ 24.

40. Inductions generally cannot be performed prior to 16 weeks lmp and are medically contraindicated for women with certain medical conditions such as severe cardiac ailments, pelvic infection, or prior Cesarean sections. (deProsse Decl. ¶¶ 28, 52; Seeds Dep. at 78:19–79:3.) Medical literature indicates that D & E's are statistically safer than inductions. (deProsse Decl. ¶¶ 51–54;) *see also Richmond Med. Ctr.*, 55 F.Supp.2d at 456–57, (Giles Dep. at 109:12–112:24.)

41. Induction abortions involve the same medical complications as labor and delivery at full-term. (deProsse Decl. ¶ 50; *see also* Giles Dep. at 119:2–8.) Certain complications are also associated with each specific method of induction, and the injections sometimes used to induce the preterm labor themselves also have contraindications. (deProsse Decl. ¶¶ 27, 53–54.)

42. The risk of any abortion procedure depends to some extent on the skill of the provider at implementing that type of procedure. (deProsse Decl. ¶¶ 45, 47; Giles Dep. at 128:5–8.)

43. Since 1980, Dr. Fitzhugh has performed inductions in only a few instances. (Fitzhugh Decl. ¶ 23.)

44. Defendants' expert, Dr. Giles, agrees that in a situation when the physician has not performed an induction in many years, the doctor should have the flexibility to perform a D & E in the manner that is safe and medically appro-

priate. (Giles Dep. at 128:5–129:6; *see also* deProsse Decl. ¶¶ 25, 41, 51, 57.)

45. Two older methods of abortion are hysterotomy and hysterectomy, which are very rarely used today. (deProsse Decl. ¶ 21; Fitzhugh Decl. ¶¶ 23–24; Seeds Dep. at 85:20–86:16;) *see also* 8/22/03 Order, FF ¶ 16. Hysterotomy is a pre-term Cesarean section. (Fitzhugh Decl. ¶ 24; deProsse Decl. ¶¶ 29, 56; *see also* Seeds Dep. at 85:10–16.) Hysterectomy is the removal of the uterus, and it leaves the woman unable to bear children. (Fitzhugh Decl. ¶ 24; deProsse Decl. ¶ 29; *see also* Seeds Dep. at 85:18–19.) Both are significantly riskier in terms of a woman's mortality and morbidity than other abortion procedures and are not medically acceptable abortion procedures except in very rare circumstances when they are specifically medically indicated. (Fitzhugh Decl. ¶ 24; deProsse Decl. ¶ 55; Seeds Dep. at 85:25–86:12; Giles Dep. 123:25–124:7.) *See also Richmond Med. Ctr.*, 55 F.Supp.2d at 457. Because both involve abdominal removal, rather than vaginal delivery, of the fetus, neither of these riskier methods appears to be affected by the Act.

*Effect of the Act on Dr. Fitzhugh's Practice*

46. Dr. Fitzhugh both performs D & E's and completes first trimester miscarriages in which he encounters various factual scenarios whereby completing the procedure on a pre-viable fetus in the safest, most medically appropriate manner will constitute the crime of "partial birth infanticide." (Fitzhugh Decl. ¶¶ 2, 25–34; *see also* deProsse Decl. ¶¶ 22–26.) *See also* 8/22/03 Order, FF ¶ 25.

47. Dr. Fitzhugh may violate the Act by completing a miscarriage for a patient. Sometimes Dr. Fitzhugh must complete a miscarriage for a woman who presents in his office mid-miscarriage with the fetus positioned in her vagina. (Fitzhugh Decl.

¶ 29.) The fetus at that point will show signs of life. Because the umbilical cord is not long in early gestations, in such circumstances he must and does deliberately separate the umbilical cord in the vagina before then removing the fetus, an act that is intended to and will "kill" the fetus. (*Id.*) In such a situation, Dr. Fitzhugh would violate the Act when completing a miscarriage for a woman in this safe and medically appropriate manner. (*Id.*) *See also* 8/22/03 Order, FF ¶ 30.

48. In performing a D & E, Dr. Fitzhugh, like all physicians, always intends to remove the fetus from the woman, and with a nonviable, living fetus, this act will, by definition, result in fetal demise. (Fitzhugh Decl. ¶¶ 17, 21; Seeds Dep. at 71:2–5.) *See also* 8/22/03 Order, FF ¶ 26. As discussed in more detail in the paragraphs below, in order to complete the abortion in a safe and medically appropriate manner, Dr. Fitzhugh may be required to perform "a deliberate act that is intended to kill" the fetus and that "does kill" the fetus, in a way that may *not* "involv[e] dismemberment of the fetus prior to removal from the body of the mother." (Fitzhugh Decl. ¶¶ 30, 32–34.) *See also* 8/22/03 Order, FF ¶ 26.

49. One situation in which Dr. Fitzhugh may violate the Act occurs during a D & E that involves dismemberment when he is presented with a situation that is not uncommon in his practice—where there is little or no space between the cervix and the vaginal introitus. (Fitzhugh Decl. ¶¶ 18, 32; Fitzhugh Dep. at 52–61; *see* deProsse Dep. at 60:16–61:9.) *See also* 8/22/03 Order, FF ¶ 28. If dismemberment occurs while Dr. Fitzhugh is pulling the fetus through the cervical os with forceps, it will generally occur beyond the cervical opening, (*supra,* ¶ 27), and—if the cervix is close to or outside of the vaginal introitus—beyond the vaginal introitus, thus "outside the woman's body." (Fitz-

hugh Decl. ¶¶ 18–19, 32; deProsse ¶¶ 23–24; *supra,* ¶ 28.) Because disarticulation of the fetus does not always cause immediate fetal demise, the fetus may still show "evidence of life" when the part of the body specified in the Act (the head or some part of the trunk beyond the navel) is "outside the body" of the woman, and a deliberate act, such as compression of the fetal skull, transecting the umbilical cord, or dismemberment is performed at that point to complete the procedure. (Fitzhugh Decl. ¶¶ 18, 30–32; deProsse ¶¶ 22–24.) A D & E completed in such a manner would violate the Act.

50. It is also unclear to Dr. Fitzhugh what "dismemberment" encompasses in subsection B of the Act, the subsection that makes an exception to its prohibitions for D & E procedures "involving dismemberment of the fetus prior to removal from the body of the mother." (Fitzhugh Decl. ¶ 31.) He is unsure whether, if a finger disjoins from the fetus, the abortion he performed automatically falls under the exception to the Act, or must more of the fetus be dismembered? Additionally, Dr. Fitzhugh does not know whether "prior to removal from the body of the mother" means prior to the removal of the entire fetus or only part thereof. (*Id.*) If the Act were interpreted to mean any part of the fetus, then very few D & E's he performs would fall under that exception. And if the exception applies to fetuses that have been dismembered prior to removal of only part of the fetus, it is unclear how much of the fetus must still be in the "body of the mother" for the exception to apply. (*Id.*)

51. Another scenario that may occur while Dr. Fitzhugh performs a D & E that would put him in violation of the Act is when · dilation causes the fetus to pass through the cervix intact or largely intact. (*See* Fitzhugh Decl. ¶¶ 20, 33–34; *see also* deProsse Decl ¶¶ 22, 25.) Because the

skull is the largest part of the fetus, it is often too large to pass safely through the woman's cervical os. (deProsse Decl. ¶ 22; Fitzhugh Decl. ¶¶ 20, 33; Christmas Decl. ¶ 8.) Thus, Dr. Fitzhugh often needs to compress the head of the pre-viable fetus showing evidence of life using forceps, thereby performing a "deliberate act" that is "intended to kill" and "does kill" the fetus, in order to complete the abortion of what is defined under the Act as a "human infant born alive." (Fitzhugh Decl. ¶¶ 20, 33–34; deProsse Decl. ¶¶ 22, 25.) *See also* 8/22/03 Order, FF ¶ 29; *Richmond Med. Ctr.,* 55 F.Supp.2d at 454 ("Intact removal of a previable fetus, by definition, kills the fetus."); *id.* at 454–55 (noting that "Dr. Fitzhugh has removed an intact fetus during a D & E" and that "[t]hese circumstances can and do occur not infrequently").

52. Defendants concede that Dr. Fitzhugh may violate the Act when performing a D & E where the fetus comes out intact or largely intact. (Defs.' Mem. in Opp. to Pl's. Mot. for T.R.O. & Prelim. Inj. at 9–10 ("Def. Opp. to TRO"); 8/14/03 Tr. 11:11–16 (Pls' App. Tab 13).) *See also* 8/22/03 Order, FF ¶ 25.

53. Because Dr. Fitzhugh could face criminal prosecution under the Act for some D & E's he performs, Dr. Fitzhugh faces the possibility of such prosecution every time he performs a D & E abortion since there is no way for him to know before he begins any given D & E whether that particular D & E will result in a situation where he must take steps in violation of the Act in order to complete the procedure in the manner he deems most appropriate for the woman's health. (Fitzhugh Decl. ¶ 2; Fitzhugh Dep. at 81:21–82:9; *see also* deProsse Decl. ¶¶ 41, 57, Giles Dep. at 51:17–22;) 8/22/03 Order, FF ¶ 27; *supra,* ¶¶ 32–33.

54. If the Act takes effect, Dr. Fitzhugh would have to choose between continuing to practice medicine in the manner that is safest for his patients and risk jail, or stopping his performance of second-trimester abortions and certain other procedures. (Fitzhugh Decl. ¶ 40.)

*Defendants' Lack of Relevant or Credible Evidence*

 55. Defendants submitted a declaration of Dr. Giles in which he avers that in *one* situation Dr. Fitzhugh encounters in which he would violate the Act, when the fetal head becomes lodged in the cervical os during a D & E, he believes it is safer to administer Terbutaline or nitroglycerine to the patient to facilitate additional dilation, rather than compress the skull. (Giles Decl. ¶ 6 (Pls' App. Tab 14); *see also* Giles Dep. at 61.) Dr. Giles, however, has no relevant experience to offer that opinion. Dr. Giles testified that he can recall no occasion on which he has used medication—including Terbutaline, nitroglycerine, fluothane or halothane—to achieve cervical dilation during a D & E, nor even any occasion at all during the performance of a D & E when the fetal head became lodged. (Giles Dep. at 82:2–7, 83:10–84:7; *see also id.* at 62:8–63:524 (quoting prior testimony).)

56. Moreover, there is no medical support for Dr. Giles' "alternative medication method" for completing a D & E when the fetal head is lodged in the cervix as a safe alternative beyond Dr. Giles' statement, which is unsupported by citation. (Giles Decl. ¶ 6; *see also* Giles Dep. at 8:16–21; 72:25–73:14.) Such steps are not cited in accepted medical literature, *see* Warren Hern, M.D., M.P.H., Ph.D., *Abortion Practice,* (1990), Maureen Paul, M.D., M.P.H., et al., *A Clinician's Guide to Medical and Surgical Abortion,* (1999), and Dr. Giles admits as much. (Giles Dep. at 74:2–9.) Dr. Giles further admits that no studies have ever been done regarding the use of Terbutaline, nitroglycerine, fluothane, or

halothane in second-trimester D & E's. (Giles Dep. at 8:16–21; 72:25–73:14; *see also* Dep. of Dr. Fitzhugh dated July 29, 1998, in *Richmond Med. Ctr. v. Gilmore* at 143:18–145:18 (Pls' App. Tab 15).) Nor can Dr. Giles name any physician who has used such medication to complete a D & E where the fetal head was lodged in the woman's cervix. (Giles Dep. at 75:6–76:3.)

57. Furthermore, evidence, including testimony by defendants' own expert, Dr. Seeds, indicates that the administration of those medications would be completely ineffective in aiding cervical dilation. (Christmas Decl. ¶¶ 10–11; Seeds Dep. at 97:4–25; deProsse Dep. at 69:9–70:12.) Additionally, administration of those medications presents its own risks (Christmas Decl. ¶ 11), and they would be contraindicated in some patients. (*Id.;* Seeds Dep. at 99:7–100:4.)

58. In addition, Dr. Giles' testimony is not credible for several reasons. First, his experience with D & E's is minimal: Dr. Giles has performed only one D & E abortion since 1998 (Giles Dep. at 24:5–25:6, 25:24–26:10); in the years before 1998, since the middle of the 1980s, Dr. Giles performed at most four D & E's per year (*id.* at 26:14–28:5); 85–90% of the second-trimester abortions Dr. Giles performs are inductions (*id.* at 27:5–12); and D & E's have always constituted a small percentage of the second-trimester procedures he performs. (Trial Testimony of Harlan Raymond Giles, M.D., dated Aug. 19, 1998, in *Richmond Med. Ctr. v. Gilmore* ("Giles Trial Test. (*Gilmore*)"), at 332:3–6 (Pls' App. Tab 16).) Additionally, Dr. Giles admits that he does not regularly review medical literature on abortion. (Giles Dep. at 111:11–15.) Finally, methods Dr. Giles advocates for completing D & E's, such as waiting for a few hours for a lodged fetal head to expel on its own, even if a partially dismembered fetus is positioned inside the woman, (Giles Dep. at 65:17–66:17), fall below the accepted standard of care. (Christmas Decl. ¶ 9.)

59. Second, and more significant, Dr. Giles' sworn testimony is unreliable because it is inconsistent and incoherent. *Compare* Giles Dep. (*Doyle*) at 110:4–22 (testifying that forceps would be his first choice in order to facilitate the removal of a lodged fetal skull of a pre-viable fetus during a D & E) *with* Giles Dep. at 61:12–63:5 (stating that compression of the fetal skull using forceps is a "last resort," yet acknowledging that prior conflicting testimony in *Doyle* was given under oath). His testimony regarding his use of his "medication" alternative during D & E's is even more incoherent. *Compare* Giles Dep. at 82:2–7, 83:10–84:7, 62:8–63:5 (recalling no occasion on which he has used medication to achieve cervical dilation during a D & E) *with* Giles Trial Test. (*Gilmore*) at 416:13–15 (testifying that he has used his medication alternative during D & E's on a number of occasions); *compare* Dep. of Harlan Giles, May 2, 1997, in *Evans v. Kelley* ("Giles Dep. (*Evans*)") at 24:12–16 (testifying that he would not do a D & E procedure at a fetal gestational age later than 20 weeks) (Pls' App. Tab 17) *with* Trial Test. of Harlan Giles, dated May 27, 1999, in *Planned Parenthood v. Doyle* at 239:3–6 (testifying that he has never used cervical relaxants during a D & E procedure prior to 24 weeks gestation) (Pls' App. Tab 18) *with* Giles Dep. at 67:14–68:21 (testifying that he has used cervical relaxants during D & E's only *up to* 20 weeks gestation). Not surprisingly, Dr. Giles has testified that "[a]ny doctor could offer an opinion that something is safer or less safe," and includes himself in that category. (Giles Trial Test (*Gilmore*) at 389:3–4; Giles Dep. at 114:11–17.)

60. Similarly, in sworn testimony, Dr. Giles' estimates of the total number of abortions he has performed has varied

wildly, from around 1,000 to 12,000 or even more. *See* Giles Dep. at 37:9–47:5. Likewise, his estimates of the total number of D & E's he has performed over his career, using various figures and percentages that he has testified to over time, range from approximately 38 to 1,000. *See id.*

61. Dr. Giles' lack of credibility is not limited to this case. This Court and numerous others have previously discredited Dr. Giles as an expert in abortion methods and the practice of medicine. *See, e.g., Richmond Med. Ctr.*, 55 F.Supp.2d at 450–51 (finding Dr. Giles more focused on the political aspects of the abortion debate than on the medical questions essential to resolution of issues in case); *Oliveira v. Jacobson*, No. Civ. A. PC 99–675, 2002 WL 1288783, at *1 (R.I.Super. May 22, 2002) (noting that Dr. Giles' credibility was "shredded" as omissions and misrepresentations on his curriculum vitae and "misstatements" in past depositions were exposed); *Evans v. Kelley*, 977 F.Supp. 1283, 1309–10 (E.D.Mich.1997) (noting that Dr. Giles testified about meaning of Michigan statute without being familiar with its language); *Women's Med. Prof'l Corp. v. Voinovich*, 911 F.Supp. 1051, 1070 (S.D.Ohio 1995) (finding Dr. Giles' criticisms of the D & X procedure unpersuasive), *aff'd*, 130 F.3d 187 (6th Cir.1997); *see also* 8/22/03 Order, FF ¶ 37.

62. Dr. Seeds, defendants' only other expert, admits that he is not an expert on D & E's, nor an expert on abortions. (Seeds Dep. at 48:16–49:12.) Dr. Seeds has not performed a single D & E abortion over the course of his 30–year career, (*id.* at 32:5–9), nor does he observe his colleagues at MCV perform the procedure (*id.* at 44:18–20). During his entire career, Dr. Seeds has observed only three or four D & E's, and those were over 12 years ago. (*Id.* at 45:7–14.)

## II. LEGAL STANDARD

When "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law," summary judgment must be granted pursuant to Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 56(c); *see also Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003); *Allstate Financial Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir. 1991). Once the moving party discharges its burden by showing that there is an absence of genuine issue as to any material fact, the burden shifts to the nonmoving party to produce sufficient evidence demonstrating that there is a genuine issue for trial. *Kitchen v. Upshaw*, 286 F.3d 179, 182 (4th Cir.2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505. They must be significantly probative, not merely colorable, and must be sufficient for a jury to return a verdict for the nonmoving party. A mere scintilla of evidence supporting the case is insufficient. *See, e.g., Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994).

## III. DISCUSSION

### A. Motions to Strike

The Court has found Dr. Giles' testimony to be unsupported, not credible, and

unreliable. *See supra,* FF ¶¶ 55–61. Based on *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) and *Daubert v. Merrell Dow,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Dr. Giles' opinions are unreliable and therefore inadmissible. Even more significant, however, is the Court's finding that Dr. Giles' testimony is inconsistent and incoherent. Given this inconsistency, the Court will grant plaintiffs' motion to strike Dr. Giles' testimony as a whole.

The Court has found Dr. Seeds not to be an expert on abortions nor on D & E's. *See supra,* FF ¶ 62. Based on *Kumho Tire* and *Daubert,* Dr. Seeds' opinions challenged by the plaintiffs are unreliable and inadmissible. Accordingly, the Court will grant plaintiffs' motion to strike selected portions of Dr. Seeds' sworn testimony.

■ The Court also finds the documents challenged by plaintiffs to be irrelevant hearsay and inadmissible. The list of seven medical abstracts and article titles, defendants' Exhibit J, is hearsay not covered by any exception, which is therefore inadmissible. The list is also irrelevant. The four documents related to H.R. 760, which was a bill in the United States Congress later passed by both houses with slightly altered text (Exhibits L, M, N, and O), are also irrelevant and contain hearsay not covered by an exception. These documents may not be admitted under Federal Rule of Evidence 803(8)(c). Each of the exhibits lacks an indicia of trustworthiness. Courts have consistently excluded congressional reports, finding that they did not satisfy the requirements of Rule 803(8)(c) because of the inherently political nature of the reports. *See, e.g., Anderson v. City of New York,* 657 F.Supp. 1571, 1579 (S.D.N.Y.1987) (excluding a congressional report because it lacked the "ordinary indicia of reliability"); *Baker v. Firestone Tire & Rubber Co.,* 793 F.2d 1196, 1199 (11th Cir.1986) (finding congressional report lacked trustworthiness and was thus inadmissible because it was politically motivated); *Bright v. Firestone Tire & Rubber Co.,* 756 F.2d 19 (6th Cir.1984) (per curiam). The House Report (Exhibit L) represents the political position of the representatives who voted for it. It is untrustworthy and inadmissible. Defendants also submitted the first 26 pages of House Report 108–58 (Exhibit M), a 154–page report. It is also political, untrustworthy, and inadmissible. Exhibit N, the statement of Dr. Mark G. Neerhof before the House of Representatives, is also irrelevant and constitutes inadmissible hearsay. It is not even a public record or report. Dr. Neerhof is a non-expert making a statement regarding a piece of federal legislation. Exhibit O, the statement of Law Professor Gerard V. Bradley, is inadmissible hearsay. It also impermissibly asserts legal conclusions. Exhibit P, the AMA Statement, and the newspaper articles cited in footnote 7 of defendants' brief are all inadmissible hearsay as well. For these reasons, the plaintiffs' motion to strike exhibits and other documents will be granted.

## B. *Motion for Summary Judgment*

### 1. *The Constitutional Right to Privacy*

The plaintiffs argue that the Act contains the same flaws that led the Supreme Court to invalidate the Nebraska statute in *Carhart.* In *Carhart,* the Supreme Court held that Nebraska's ban on "partial-birth abortion" was unconstitutional on its face because it endangered, rather than promoted, women's health. 530 U.S. at 930, 938, 946, 120 S.Ct. 2597. Specifically, the Supreme Court held the Nebraska statute banning partial birth abortions unconstitutional for two reasons: (1) because it caused "[a]ll those who perform abortion procedures using [the D & E] method [to]

fear prosecution, conviction and imprisonment," placing "an undue burden upon a woman's right to make an abortion decision," *Carhart,* 530 U.S. at 945–46, 120 S.Ct. 2597; and, (2) because it failed to contain a health exception even though substantial medical authority supported the proposition that banning intact D & E's would endanger women's health. *Id.* at 936–37, 120 S.Ct. 2597. The Court agrees with the plaintiffs and finds the Act unconstitutional on its face for precisely the same reasons.[1]

■ First, the Act is unconstitutional because it fails to contain a health exception. Pursuant to *Carhart,* the Act must contain a health exception. The Supreme Court stated:

> [T]he governing standard requires an exception 'where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother,' *Casey, supra* at 879[, 112 S.Ct. 2791], for this Court has made clear that a State may promote but not endanger a woman's health when it regulates the methods of abortion.

*Carhart,* 530 U.S. at 931[, 120 S.Ct. 2597] (citations omitted). The Court emphasized that it is impermissible for a state to subject women's health to significant risks by forcing women, through regulation, to use riskier *methods* of abortion. *Id.* ("Our cases have repeatedly invalidated statutes that in the process of regulating the methods of abortion, imposed significant health risks."). Thus, the Court held that "where substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's

health, *Casey* requires the statute to include a health exception when the procedure is necessary, in appropriate medical judgment for the preservation of the life or health of the mother." *Id.* at 938, 120 S.Ct. 2597 (internal citations and quotations omitted).

The Court held that even if the Nebraska statute could have been interpreted to ban *only* the intact D & E method of abortion performed by the plaintiff in that case, it would still have been unconstitutional. *Id.* at 937, 120 S.Ct. 2597. The burden was on the State of Nebraska to demonstrate that banning intact D & E's "without a health exception may not create significant health risks for women." *Id.* at 932, 120 S.Ct. 2597, *see also id.* at 928–29, 120 S.Ct. 2597 (noting that intact D & E's and D & X's are sufficiently similar so that the terms can be used interchangeably). The Court held that Nebraska did not meet that burden because "[w]here a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary." *Id.* at 937–38, 120 S.Ct. 2597. Further, in the previous Virginia case, Judge Luttig, writing for the United States Court of Appeals for the Fourth Circuit and addressing the *Carhart* decision, stated, "The Court has [ ] unequivocally held that any ban on partial-birth abortion must include an exception for the health of the mother in order to be constitutional." *Richmond Med. Ctr., for Women v. Gilmore,* 219 F.3d 376, 377 (4th Cir.2000). The Tenth Circuit has

---

1. Pursuant to *Carhart,* the Court rejects the defendants' argument that the Court should apply the "no set of circumstances" test from *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). *Carhart* did not apply the *Salerno* analysis or even the framework from *Planned Parenthood v. Casey,*

505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) in facially striking down the Nebraska statute. *See Carhart* at 922, 120 S.Ct. 2597; *id.* at 1019, 120 S.Ct. 2597 (Thomas, J., dissenting). The plaintiffs have met their burden for a facial challenge.

also interpreted *Carhart* to require a health exception. *Planned Parenthood v. Owens,* 287 F.3d 910, 917–18 (10th Cir. 2002) ("*Stenberg* also confirmed that the lack of a health exception is a sufficient ground for invalidating a state abortion statute.").

There is substantial medical authority, including testimony from defendants' experts, that supports the proposition that banning D & E's, and the manner in which Dr. Fitzhugh performs D & E's, including intact D & E's, could endanger women's health. Through testimony and declaration, Dr. Fitzhugh and Dr. deProsse have stated that the manner in which Dr. Fitzhugh performs D & E's that are prohibited by the Act is both the safest and most medically appropriate for some of his patients and have relied on their experience and additional medical authority in forming those opinions. (Fitzhugh Decl. ¶¶ 19–20, 22–24, 33; deProsse Decl. ¶¶ 22–26, 41, 44–46, 50–55; deProsse Dep. at 82:6–83:13; *see also* Christmas Decl. ¶ 8;) 8/22/03 Order, FF ¶ 32; *Carhart,* 530 U.S. at 936–37, 120 S.Ct. 2597 (concluding that substantial medical authority, including statements from the American College of Obstetricians and Gynecologists, supports proposition that banning intact D & E's would endanger women's health such that Constitution requires a ban on such procedures to contain a health exception); *Richmond Med. Ctr.,* 55 F.Supp.2d at 453–54, 490. Dr. Giles, defendants' own expert, does not disagree. Dr. Giles testified that the manner in which Dr. Fitzhugh completes D & E's is medically acceptable and that criminalizing the way Dr. Fitzhugh performs them could endanger women's health. (Giles Dep. at 84:9–85:6, 85:24–86:5, 92:21–93:20, 128:15–129:6; Fitzhugh Decl. ¶ 23;) *see also supra,* FF ¶¶ 33 & 34. Therefore, the Act is unconstitutional because it does not contain a health exception.

Also, even if the Act criminalized only intact D & E's—which the defendants concede are banned by the Act—the record is clear that intact D & E's have many safety advantages over D & E's involving dismemberment. *See* 8/22/03 Order, FF ¶¶ 31, 32. The defendants cannot meet the burden for upholding the Act despite its lack of a health exception—that is, by proving that a health exception is *never* necessary to preserve the health of women. *Carhart,* 530 U.S. at 937–38, 120 S.Ct. 2597; *supra,* FF ¶ 35. Even if the defendants could present credible evidence disagreeing with the evidence in this case, such opinions would not meet defendant's burden. As the Supreme Court explained in *Carhart:*

> Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likelihood that those who believe that D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences.

530 U.S. at 938, 120 S.Ct. 2597.

Further, the Court is not persuaded by the argument that the instances in which Dr. Fitzhugh would actually violate the Act are rare and that therefore a health exception is not required. As the Supreme Court stated in *Carhart,* the argument of "relative rarity . . . is not highly relevant." *Id.* at 934, 120 S.Ct. 2597. "[T]he state cannot prohibit a person from obtaining treatment simply by pointing out that most people do not need it." *Id.* In addition, the Court rejects the argument that the "life exception" saves the Act. The

Act must include an exception for both the woman's life and health. *See Carhart,* 530 U.S. at 921, 936–37, 120 S.Ct. 2597.

The Court also rejects any argument that the Act could be read to contain a health exception. There are two applicable rules of statutory construction. First, *"expressio unis est exclusio alterius,"* which "instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded." *See Reyes–Gaona v. North Carolina Growers Ass'n, Inc.,* 250 F.3d 861, 865 (4th Cir.2001). Second, since there is no ambiguity in the language of the Act, the Court's "analysis must end with the statute's plain language." *See Hillman v. I.R.S.,* 263 F.3d 338, 342 (4th Cir.2001). Thus, under applicable rules of statutory construction and based on the records of the Virginia General Assembly, which show that the General Assembly rejected amendments that would have provided an exception for some circumstances when the woman's health was at risk, it is cleat that the General Assembly intentionally omitted an exception for the woman's health. *See supra,* FF ¶¶ 7–11. Accordingly, since the Act must include an exception for both the woman's life and the woman's health and since it does not, it is unconstitutional on its face.

■ Second, the Act also places an undue burden on women's constitutional right to choose an abortion. The plain language of the Act bans pre-viability D & E's and would cause those who perform such D & E's to fear prosecution, conviction and imprisonment. The Act, like the Nebraska statute at issue in *Carhart* and like Virginia's previous attempt at a "partial birth" ban, ignores the Supreme Court's "established [ ] line of demarcation for a State's ability to regulate and proscribe abortion in terms of whether the fetus was viable or nonviable," and instead tries to establish a line in "terms of whether a fetus was in the process of being born." *See Richmond Med. Ctr.,* 55 F.Supp.2d at 480. As the Supreme Court stated in *Carhart,* by imposing " 'an undue burden on a woman's ability' to choose a D & E abortion," the statute unduly burdened "the right to choose abortion itself." 530 U.S. at 930, 120 S.Ct. 2597 (quoting *Casey,* 505 U.S. at 874, 112 S.Ct. 2791). Like the Nebraska statute, the Act also places an undue burden on a woman's ability to choose a D & E abortion and therefore unduly burdens "the right to choose abortion itself." Based on the Court's findings of fact, *see supra,* FF ¶¶ 1–3, 4, 7, 46–54, and on the law as set forth in *Carhart,* the Act imposes an impermissible undue burden on the constitutional right to choose an abortion. *See Carhart,* 530 U.S. at 945–46, 120 S.Ct. 2597.

■ Further, the Act's "life exception" is also constitutionally inadequate. Subsection E, the Act's life exception, impermissibly requires physicians to prioritize the "health and life" of a pre-viable fetus ahead of the well-being of a woman seeking an abortion. *See supra,* FF ¶ 7. Subsection E's life exception applies only for a "procedure that, in reasonable medical judgment, is *necessary* to prevent the death of the mother." Thus, the exception is limited to situations in which the abortion procedure that violated the Act is the *only* procedure that would have saved the woman's life, and it would not apply if a more dangerous abortion procedure—induction, hysterectomy, or hysterotomy—could have been performed and prevented the death of the woman. *See supra,* FF ¶¶ 40–42, 45. Therefore, the "life exception" forces women to undergo riskier abortion procedures, even when the abortion is necessary to safe her life. Under *Carhart,* "a State may promote but not

endanger a woman's health when it regulates the methods of abortion." 530 U.S. at 931, 120 S.Ct. 2597. Subsection E also requires the physician to take "every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant," in order to be exempt from prosecution. By doing so, the Act, like the previous Virginia statute, "constitutes an impermissible 'trade-off' between women's health and fetal survival." *Richmond Med. Ctr.*, 55 F.Supp.2d at 485. "It is settled that, when state legislation demands such a 'trade-off' before fetal viability, it places a 'substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Id.* Accordingly, the "life exception" also renders the Act unconstitutional.

■■ Finally, the Act also bans safe gynecological procedures in addition to abortion without a compelling interest. The Due Process Clause protects a person's right to choose the type of medical care she receives. Therefore, any infringement by the government upon that right is subject to strict scrutiny and will be upheld only if the infringement is narrowly tailored to further a compelling interest. *See Carey v. Population Serv. Int'l,* 431 U.S. 678, 684–686, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). The Act could be interpreted to subject Dr. Fitzhugh to prosecution for completing a miscarriage in a safe and medically appropriate manner for a woman who presents in his office mid-miscarriage. *See supra,* FF ¶ 47. Thus, the Act infringes on women's constitutionally protected rights to preserve their bodily integrity and to choose the type of medical care that they receive. Virginia has no compelling interest. Accordingly, this also renders the Act unconstitutional.

### 2. Vagueness

■ Plaintiffs also argue that the Act is void for vagueness, in violation of the Due Process Clause, because its failure to clearly define the prohibited medical procedures deprives physicians of fair notice. *See, e.g., Carhart v. Stenberg,* 11 F.Supp.2d 1099, 1132 (D.Neb.1998) (explaining that "[a] criminal law, especially one banning protected constitutional freedoms like abortion, that fails to give fair warning or that allows arbitrary prosecution is 'void for vagueness'"), *aff'd,* 192 F.3d 1142 (8th Cir.1999), *aff'd,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Judge Payne addressed this issue with regard to the previous Virginia statute, noting that "law enforcement officials and prosecutors, who—unlike the Plaintiffs, generally are not trained in obstetrics—likewise are left adrift when it comes to ascertaining the Act's reach." *Richmond Med. Ctr.,* 55 F.Supp.2d at 494 n. 63. The Court agrees with the plaintiffs and finds the Act impermissibly void for vagueness.

■ A law is void for vagueness where persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Smith v. Goguen,* 415 U.S. 566, 573 n. 8, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)); *South Carolina Med. Ass'n v. Thompson,* 327 F.3d 346, 354 (4th Cir.2003). Vague statutes offend several basic principles of due process. An individual must have adequate notice as to what conduct is prohibited, so that he or she may act accordingly. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Where the prohibited conduct is vaguely defined, the statute threatens to "trap the innocent by not providing fair warning." *Id.* Vague statutes also invite uneven or

discriminatory law enforcement and conviction because they fail to provide clear standards to law enforcement officials. *Id.* at 108–09, 92 S.Ct. 2294. Where "a statute imposes criminal penalties, the standard of certainty is higher." *Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Garner v. White,* 726 F.2d 1274, 1278 (8th Cir.1984) (emphasizing that "[g]reater specificity is required of laws imposing criminal penalties and those infringing on constitutionally protected rights"). Failure to satisfy this especially stringent standard necessitates that the law be held vague on its face "even when [the law] could conceivably have had some valid application." *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. 1855. Where a statute reaches a "substantial amount of constitutionally protected conduct," it need not be vague in all its applications. *Id.* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)).

Several of the terms in the Act are especially ambiguous: "from its mother," "from the body of the mother," "outside the body of the mother," and "involving dismemberment of the fetus prior to removal from the body of the mother." The "life exception," Subsection E, is so confusing as to be meaningless. The requirement of taking steps to preserve the fetus makes no sense since the exception applies only when a physician both intends to and does "kill the fetus."

The Act does not meet the high degree of clarity required where "the uncertainty induced by the statute threatens to inhibit the exercise of constitutional rights." *Richmond Med. Ctr.,* 55 F.Supp.2d at 494 (quoting *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)). For these reasons, the Court finds the Act invalid on its face because it is impermissibly void for vagueness.

## IV. CONCLUSION

Having considered the pleadings, the exhibits, and the arguments of counsel, the Court concludes that no genuine issue of material fact exists and that plaintiffs are entitled to judgment as a matter of law. The Court further concludes as a matter of law that the Act is unconstitutional on its face. It violates the constitutional right to privacy, it impermissibly infringes on the fundamental right to choose an abortion because it imposes an undue burden on that right and because it contains no health exception and an inadequate life exception, and it is impermissibly void for vagueness. Having found the Act to be unconstitutional on its face, the Court will grant plaintiffs' motion for summary judgment, will grant plaintiffs' request for declaratory relief, and will permanently enjoin the Act in its entirety.

An appropriate Order shall issue.

## FINAL ORDER

This matter is before the Court on the plaintiffs' motion for summary judgment. Also pending are plaintiffs' motions to strike (1) selected portions of Dr. Giles' sworn testimony; (2) selected portions of Dr. Seeds' sworn testimony; and (3) exhibits and other documents.

Having considered the pleadings, the exhibits, and the arguments of counsel, the Court concludes that no genuine issue of material fact exists and that plaintiffs are entitled to judgment as a matter of law. The Court further concludes as a matter of law that the Act is unconstitutional on its face. It violates the constitutional right to privacy, it impermissibly infringes on the fundamental right to choose an abortion because it imposes an undue burden on that right and because it contains no health exception and an inadequate life exception, and it is impermissibly void for vagueness. Accordingly, the plaintiffs'

motion for summary judgment is GRANT-ED, their request for declaratory relief is GRANTED, and their request for permanent injunctive relief is GRANTED. The Act, Va.Code Ann. § 18.2–71.1, is DE-CLARED unconstitutional on its face. The defendants, and their employees, agents, and successors, are PERMANENTLY ENJOINED from enforcing Va. Code Ann. § 18.2–71.1.

The Court also GRANTS plaintiffs' motions to strike (1) Dr. Giles' sworn testimony, which is stricken as a whole; (2) selected portions of Dr. Seeds' sworn testimony; and (3) certain exhibits and other documents.

It is so ORDERED.

Let the Clerk SEND a copy of this Final Order and the accompanying Memorandum Opinion to all counsel of record.