NIEMEYER, Circuit Judge,
dissenting:
In Gonzales v. Carhart, 550 U.S. -, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), the Supreme Court held that the federal partial-birth abortion statute is constitutional. Because the federal statute is like Virginia’s partial birth infanticide statute, the Supreme Court granted Virginia’s petition for a writ of certiorari in this case, vacated our judgment holding Virginia’s statute unconstitutional, and remanded this case back to us for reconsideration in light of Gonzales v. Carhart. See Herring v. Richmond Med. Ctr. for Women, — U.S. -, 127 S.Ct. 2094, 167 L.Ed.2d 810 (2007). With a troubling opinion, the majority now seeks to circumvent the Supreme Court’s ruling in Gonzales v. Car-hart, unwittingly inviting the Supreme Court to spell out in this case that Virginia’s statute is likewise constitutional, because in the nature and scope of conduct prohibited, it is virtually identical to the federal statute upheld as constitutional in Gonzales v. Carhart.
In 2003, the Commonwealth of Virginia enacted a law (the “Virginia Act”) making it a criminal offense to “kill[] a human infant” by “knowingly perform[ing] partial birth infanticide.” Va.Code Ann. § 18.2-71.1(A). The Virginia Act applies to protect only a living fetus that has been delivered halfway into the world — i.e., either “the infant’s entire head is outside the body of the mother” or, for a breech delivery, “any part of the infant’s trunk past the navel is outside the body of the mother.” Id. § 18.2-71.1(D). It defines a “partial birth infanticide” as “any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.” Id. § 18.2-71.RB).
Also in 2003, Congress passed the federal Partial-Birth Abortion Ban Act of 2003 (the “Federal Act”), 18 U.S.C. § 1531, which criminalizes the same conduct — no more and no less. It makes it a criminal offense to “kill[ ] a human fetus” by “knowingly performing] a partial-birth abortion.” 18 U.S.C. § 1531(a). As with the Virginia Act, the Federal Act applies to protect only a living fetus that has been delivered halfway into the world — i.e., either “the entire fetal head is outside the body of the mother” or, for a breech delivery, “any part of the fetal trunk past the navel is outside the body of the mother.” Id. § 1531(b)(1)(A). And as with the Virginia Act, the Federal Act defines a “partial-birth abortion” to mean “deliberately and intentionally vaginally deliverpng] a living fetus ... for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus and perform[ing] the overt act, other than completion of delivery, that kills the *150 partially delivered living fetus.” Id. § 1531(b)(1).
Before Gonzales v. Carhart, a divided panel of our court struck down the Virginia Act on a facial challenge because the Act did not contain “an exception for circumstances when the banned abortion procedures are necessary to preserve a woman’s health.” Richmond Med. Ctr. for Women v. Hicks (Hicks II), 409 F.3d 619, 629 (4th Cir.2005). But shortly after we decided Hicks II, the Supreme Court upheld the Federal Act, finding it constitutional against that same attack. Gonzales v. Carhart, 127 S.Ct. at 1635-38 (rejecting a challenge based on the absence of an exception to preserve a woman’s health). In light of its finding the Federal Act constitutional, the Supreme Court vacated our decision in Hicks II and directed that we reconsider it in light of Gonzales v. Carhart.
For a second time, the majority conducts a facial review of the Virginia Act, and again it holds the Act unconstitutional. This time, the majority rationalizes the slightly different word structure in the Virginia Act to create a statute with a meaning materially different from the Federal Act and, indeed, different from the plain language of the Virginia Act. The majority concludes now that the Virginia Act imposes criminal liability on a doctor “who sets out to perform a standard D & E [abortion] that by accident becomes an intact D & E [abortion].” Ante at 131 (emphasis added). It does so even though the Virginia Act’s mens rea requirement is effectively identical to that of the Federal Act. Because the majority believes that the Virginia Act exposes doctors to liability for “accidental” violations, it concludes that the Virginia statute imposes an undue burden on a woman’s right to obtain a late-term abortion (during the second trimester) because doctors will not perform such abortions for fear of criminal liability under the Virginia Act. Thus, despite the Supreme Court’s holding in Gonzales v. Carhart, which finds a virtually identical statute constitutional, the majority again holds that the Virginia Act is unconstitutional.
Its holding, I submit, is based on a glaring misreading of both the Virginia Act and the Supreme Court’s decision in Gonzales v. Carhart.
As I demonstrate, the majority’s effort to distinguish the mens rea requirement of the Virginia Act from that in the Federal Act amounts to little more than an isolated consideration of an extraction of language from the Virginia Act, taken out of context. Contrary to the majority’s reading, the Virginia Act prohibits only the knowing performance of a “partial birth infanticide,” which is defined to include only deliberate acts to kill the human infant. Moreover, the Act explicitly excludes from its coverage the standard D & E abortion procedure, but the majority nonetheless contorts the statute to assume that such procedure is criminalized when it accidentally leads to an intact D & E abortion.
In addition, the majority conducts a facial review of the Virginia Act on the very basis rejected by the Supreme Court in Gonzales v. Carhart, where the Court observed that the respondents had failed to demonstrate that the Federal Act would be unconstitutional “in a large fraction of relevant cases” and rejected any facial challenge that was based on only “potential situation[s] that might develop.” Gonzales v. Carhart, 127 S.Ct. at 1639. The majority opinion rests on a hypothetical factual circumstance that is not contemplated by the Virginia Act — a legal standard D & E procedure that “accidentally” results in the delivery of an intact fetus— and that, according to plaintiffs own witnesses, occurs only rarely or, according to *151 Virginia’s witnesses, never occurs. An analysis based on hypothetical of the type relied on by the majority violates the express instructions of Gonzales v. Carhart for conducting facial challenges.
Finally, the majority, consisting of only two judges of our court, impermissibly overrules existing Fourth Circuit precedent which holds that in addressing a facial challenge of an abortion regulation, we must apply the standard stated in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). See McMellon v. United States, 387 F.3d 329, 332-33 (4th Cir.2004) (holding that only an en banc court may overrule an earlier panel decision).
Accordingly, as in our earlier decision, see Hicks II, 409 F.3d at 629-46 (Niemeyer, J., dissenting), I again profoundly dissent.
I
Virginia’s Act to prohibit partial birth infanticide was enacted in 2003, to take effect July 1, 2003. Two weeks before it was to take effect, Dr. William Fitzhugh, a board-certified obstetrician and gynecologist who performs abortions in Virginia, and the organization he directs, the Richmond Medical Center for Women (hereinafter collectively, “Dr. Fitzhugh”), commenced this action as a facial challenge to the constitutionality of the Virginia Act and to enjoin its enforcement before it was to take effect. No existing medical case formed the basis for Dr. Fitzhugh’s suit. Rather, his challenge of the Virginia Act was purely a facial one, based on the generalities of his abortion practice. He speculated that the Virginia Act would apply to prohibit a fraction — indeed, as he concedes, a small fraction — of the abortions he could expect to perform.
As the Supreme Court observed in Gonzales v. Carhart, the vast majority — 85 to 90% — of the approximately 1.3 million abortions performed in the United States annually are completed in the first three months of pregnancy. 127 S.Ct. at 1620. The Virginia Act regulates none of these first-trimester abortions. Most of the remaining abortions take place in the second trimester and are performed through a class of methods medically referred to as “dilation and evacuation,” the standard procedure which we refer to as a “standard D & E,” as did the Supreme Court. See Gonzales v. Carhart, 127 S.Ct. at 1620-21; Stenberg v. Carhart, 530 U.S. 914, 924, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); see also Richmond Med. Ctr. v. Hicks (Hicks I), 301 F.Supp.2d 499, 503 (E.D.Va.2004) (noting that the standard D & E “is the most common method of pre-viability second-trimester abortion, accounting for approximately 96% of all second-trimester abortions in the United States”).
The standard D & E procedure, which is not covered by either the Virginia Act or the Federal Act, begins with the doctor dilating the woman’s cervix through the use of intracervical osmotic dilators and, in some instances, medicines such as miso-prostol. Gonzales v. Carhart, 127 S.Ct. at 1620-21. The extent of dilation under this procedure varies by patient and by the type and degree of treatment administered. Id. Although the doctor cannot be certain in advance exactly how much dilation will occur, when he uses more osmotic dilators for a longer period of time he will generally produce greater dilation. In this manner, a doctor exerts at least some degree of control over the amount of dilation. Id. (“In general the longer dilators remain in the cervix, the more it will dilate. Yet the length of time doctors employ osmotic dilators varies. Some may keep dilators in the cervix for two days, while others use dilators for a day or less”). Once suffi *152 cient dilation is achieved, the doctor sucks the amniotic fluid from the uterus, which begins the extraction of fetal tissue and fetal parts. Hicks I, 301 F.Supp.2d at 504. The doctor then inserts forceps into the uterus and grasps the fetus to pull it through the cervical opening and out of the woman. Gonzales v. Carhart, 127 S.Ct. at 1621; Hicks I, 301 F.Supp.2d at 504. The traction of the fetus against the cervix as a result of the doctor’s pulling causes that part of the fetus to be torn apart from the fetus’ body. Hicks I, 301 F.Supp.2d at 504; see also Gonzales v. Carhart, 127 S.Ct. at 1621 (“For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman”); Stenberg v. Carhart, 530 U.S. at 925-26, 120 S.Ct. 2597. The doctor continues to grasp and remove the remaining fetal parts until the entire dismembered fetus is removed from the woman’s body. “A doctor may make 10 to 15 passes with the forceps to evacuate the fetus in its entirety, though sometimes removal is completed with fewer passes.” Gonzales v. Carhart, 127 S.Ct. at 1621. Thus, in the standard D & E procedure, dismemberment of the fetus occurs while the fetus is still inside the woman’s body.
Neither the Virginia Act nor the Federal Act prohibits or regulates a standard D & E. Indeed, Virginia’s Act explicitly excludes the procedure from its regulation. See Va.Code Ann. § 18.2-71.1(B).
In contrast to the standard D & E procedure is a variation referred to as the “intact D & E,” which the Virginia Act calls “partial birth infanticide,” and the Federal Act calls a “partial-birth abortion.” In the intact D & E, the doctor dilates the cervix to a greater extent so that the fetus may be pulled through the cervical opening whole and intact, not being dismembered inside the woman’s body. See Gonzales v. Carhart, 127 S.Ct. at 1621-22; Hicks I, 301 F.Supp.2d at 505. In order to achieve the greater dilation, the doctor uses up to 25 osmotic dilators for up to two full days. See Gonzales v. Carhart, 127 S.Ct. at 1621. Once sufficient dilation has occurred, the doctor “extracts the fetus in a way conducive to pulling out its entire body, instead of ripping it apart.” Id. at 1622. This is done with different procedures, depending on the fetus’ presentation. In the head-first presentation, the doctor first collapses the fetus’ head to allow it to pass through the cervical opening and then delivers the fetus intact. Stenberg v. Carhart, 530 U.S. at 927, 120 S.Ct. 2597. In a breech position, the doctor delivers the fetus’ body through the cervical opening up to the point that the doctor has access to the fetus’ head. Id.; Gonzales v. Carhart, 127 S.Ct. at 1622. Because the fetus’ head is usually too large to pass through the cervical opening, the doctor squeezes the head with forceps or punctures it with scissors and suctions out the head’s contents in order to collapse the head so that the fetus can be delivered intact. Gonzales v. Carhart, at 1622-23.
To challenge the Virginia Act, Dr. Fitz-hugh assumed that he will be presented with either of two rare circumstances during a standard D & E. Under the first circumstance, the fetus unexpectedly emerges completely from the woman without any parts becoming dismembered. In that circumstance, Dr. Fitzhugh complained that he would then have to destroy the fetus outside of the mother in violation of the Virginia Act, because “my ultimate job on any given patient is to terminate that pregnancy, which means that I don’t want a live birth.”
Under the second circumstance, he complained that in less than 0.5% of his D & E procedures, the fetus is presented in a breech position with the head of the fetus becoming lodged in the woman’s cervix. *153 In that circumstance, even though the fetus is delivered beyond the anatomical landmarks of the Virginia Act, he claimed that he would have to crush the skull or collapse it by sucking out its contents to complete the delivery of the fetus. In doing that he observed that he again would violate the Virginia Act.
With respect to Dr. Fitzhugh’s first hypothetical circumstance, the Commonwealth of Virginia agrees that Dr. Fitzhugh would violate the Virginia Act because the live, intact fetus is protected by the Act. But, the Commonwealth points out, at that point — when the living fetus has been fully delivered into the world — no abortion right under the Constitution is implicated. With respect to Dr. Fitz-hugh’s second hypothetical, the Commonwealth’s expert witnesses contend that no medical authority exists to support the need to crush the lodged fetal skull and that other medical methods to extract the intact fetus are available, such as additional dilation.
Shortly after Dr. Fitzhugh filed his suit, the district court granted his motion for a preliminary injunction against enforcement of the Virginia Act. And following discovery, the court granted his motion for summary judgment, invalidating the Virginia Act as violating the Due Process Clause of the Fourteenth Amendment. See Hicks I, 301 F.Supp.2d at 512-17. To find the Virginia Act facially unconstitutional, the district court concluded that (1) the Act lacked an exception for preservation of the woman’s health; (2) its ban on an intact D & E procedure placed an undue burden on a woman’s right to an abortion; (3) its exception for preservation of the woman’s life was inadequate; (4) it criminalized D & E abortions without a compelling state interest; and (5) it was unconstitutionally vague. Id. In reaching its decision, the district court also excluded testimony of the Commonwealth’s expert witnesses, Dr. Harlan Giles and Dr. John Seeds, concluding that Dr. Giles was inconsistent and unreliable and that Dr. Seeds was not an expert on abortions and was unreliable. Id. at 511-12.
A divided panel of this court affirmed the district court’s decision and held that the Virginia Act was unconstitutional because it lacked a health exception for the woman. See Hicks II, 409 F.3d at 626. Construing Stenberg v. Carhart to require any and all bans on partial birth abortions to contain an exception for the health of the woman, the majority invalidated the Virginia Act for its facial omission of such a health exception. See id. at 622-26.
The Supreme Court granted the Commonwealth’s petition for a writ of certiora-ri, vacated our opinion in Hicks II, and remanded the case for further consideration in light of the Supreme Court’s decision in Gonzales v. Carhart. See Herring v. Richmond Med. Ctr. for Women, — U.S. -, 127 S.Ct. 2094, 167 L.Ed.2d 810 (2007). In Gonzales v. Carhart, the Supreme Court rejected a facial attack on the Federal Act similar to that mounted against the Virginia Act. Like the Virginia Act, the Federal Act outlaws intact D & E abortions and provides no exception for the woman’s health, only for the preservation of the woman’s life. Gonzales v. Carhart, 127 S.Ct. at 1635. The Court nonetheless upheld the Federal Act because, unlike the record in Stenberg v. Carhart, the record compiled by Congress and by the district court showed medical uncertainty over whether making intact D & E abortions unavailable would ever create significant health risks. Id. at 1635-37. Additionally, the Court found that the Federal Act, unlike the Nebraska statute in Stenberg v. Carhart, does not prohibit standard D & E procedures. Id. at 1629-32.
*154 Despite the similarity of the Virginia Act to the Federal Act, the majority now focuses on what it sees as several differences in the language structure between the two Acts in order to continue to assail the Virginia Act as violating the Constitution. Through a crabbed and, I submit, untenable reading of the Virginia Act, the majority fails to recognize that the Virginia Act and the Federal Act prohibit identical conduct with the same mens rea. The holding in Gonzales v. Carhart thus requires that we uphold the constitutionality of the Virginia Act.
II
I begin by demonstrating that the Federal Act and the Virginia Act are not materially different and that therefore the constitutionality of the Virginia Act is governed by Gonzales v. Carhart.
First, the Virginia Act, like the Federal Act, was intended to prohibit only partial birth abortions — abortions in which a live fetus, delivered to an anatomical landmark, is killed. Both the Virginia Act and the Federal Act prohibit conduct consisting of (1) “the delivery of a living fetus”; (2) “delivery of a living fetus to one of these ‘anatomical “landmarks” ’ ” —the head or the navel; and (3) “an ‘overt act, other than completion of delivery, that kills the partially delivered living fetus.’ ” Gonzales v. Carhart, 127 S.Ct. at 1627 (quoting 18 U.S.C. § 1531(b)(1)(B)); cf. Va.Code Ann. § 18.2-71.1 (prohibiting the same conduct, but using phrases (1) “human infant who has been born alive, but who has not been completely extracted or expelled,” (2) “entire head is outside the body of the mother, or ... any part of the infant’s trunk past the navel,” and (3) “deliberate act that ... is intended to kill” the fetus, and excluding from criminalization “completing delivery of a living human infant”).
Specifically, the Virginia Act and the Federal Act both require scienter for criminal liability to attach. The Virginia Act criminalizes the knowing performance of “partial birth infanticide,” Va.Code Ann. § 18.2-71.1(A), which is defined as
any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled irom its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.
Id. § 18.2-71.1(B) (emphasis added). The Virginia Act thus includes a scienter requirement with language that varies only slightly from the Federal Act, which defines “partial-birth abortion” as “deliberately and intentionally vaginally delivering] a living fetus” past certain anatomical landmarks “for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and performing] the overt act, other than completion of delivery, that kills the partially delivered living fetus.” 18 U.S.C. § 1531(b)(1)(A), (B).
The object of protection under both the Federal Act and the Virginia Act is a live fetus that is delivered to an anatomical landmark, and the landmarks are the same. Under the Federal Act, they are defined as follows:
[I]n the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother.
18 U.S.C. § 1531(b)(1)(A). Under the Virginia Act, they are similarly defined:
[I]n the case of a headfirst presentation, the infant’s entire head is outside the body of the mother, or, in the case of breech presentation, any part of the in *155 fant’s trunk past the navel is outside the body of the mother.
Va.Code Ann. § 18.2-71.1(D).
Moreover, just as the Supreme Court in Gonzales v. Carhart observed that the Federal Act does not prohibit abortion methods other than the intact D & E procedure, the Virginia Act explicitly carves out the standard D & E procedure from its coverage:
The term “partial birth infanticide” shall not under any circumstances be construed to include any of the following procedures: (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation [¶] & E] abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother, or (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.
Id. § 18.2-71.1(B) (emphasis added). Finally, both Acts exempt any procedure necessary to preserve the woman’s life. See 18 U.S.C. § 1531(a); Va.Code Ann. § 18.2-71.1(E). And neither Act contains a “health” exception to preserve the health of the mother.
Thus, the Federal Act, which has been judged constitutional by the Supreme Court, and the Virginia Act, which the majority endeavors yet again to strike down as unconstitutional, criminalize precisely the same conduct — the knowing commission of “partial-birth abortion” or “partial birth infanticide,” both of which are defined the same in the two Acts.
The majority nonetheless searches for “key differences” between the Virginia Act and Federal Act in order to hold the Virginia Act unconstitutional. Specifically, the majority cites first the Federal Act’s “scienter requirements concerning all the actions involved in the prohibited abortion,” ante at 137, and reads the Virginia Act to lack equivalent scienter elements. The majority finds that the Virginia Act’s only intent requirement is connected with its prohibiting the doctor from performing “any deliberate act that ... is intended to kill [and does kill] a human infant who has been born alive, but who has not been completely extracted or expelled from its mother.” Ante at 138. The majority believes that, unlike the Federal Act, the Virginia Act contains no requirement that the doctor intend to perform an intact D & E abortion at the outset of the procedure in order to be held criminally liable under the statute. Thus, the majority concludes, “the Virginia Act reaches doctors who intend to perform a standard D & E, but who nonetheless accidentally deliver the fetus to an anatomical landmark, and who must perform a deliberate act that causes fetal demise in order to complete removal.” Ante at 138. Here, the majority strains to interpret the Virginia Act in a way that allows it to strike the Act down, and here, the majority’s reasoning is demonstrably wrong.
First, the Virginia Act explicitly states, in no uncertain terms, that “[t]he term ‘partial birth infanticide’ shall not under any circumstances be construed to include [a standard D & E abortion],” defined as “the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother.” Va.Code Ann. § 18.2-71.1(B). If the risk of liability from performing a standard D & E abortion is the sole difference between the Virginia Act and the Federal Act, then the Virginia Act’s explicit exemption of that procedure provides the same protection as the Federal Act’s .scienter requirement. Indeed, the Virginia Act explicitly directs that we are not to “construe!]” the statute to ban the standard D & E procedure “under any cir *156 cumstances.” Id. (emphasis added). Rationalizing its position to strike down the statute, the majority argues that in some “accidental” and exceedingly rare circumstances, what began as a standard D & E may end up falling within the terms of the statute’s ban. By interpreting the statute this way, the majority wholly ignores the Virginia legislature’s clear direction that we are not to so “construe[ ]” the statute to prohibit a standard D & E abortion “under any circumstances.” Id.[1]
In addition, the majority ignores the provision of the Virginia Act which provides that a doctor violates the Act only if he “knowingly performs partial birth infanticide.” Va.Code Ann. § 18.2-71.1(A) (emphasis added). He must therefore know that what he is performing is a partial birth infanticide, a concept which under the statute clearly does not include a standard D & E abortion. See id. § 18.2-71.1(B). Even if the explicit exemption were not included in the Virginia Act, the scienter requirement that the doctor “knowingly perform! ] partial birth infanticide” prevents liability from attaching. “This follows from the general principle that where scienter is required no crime is committed absent the requisite state of mind.” Gonzales v. Carhart, 127 S.Ct. at 1628. The difference between the intact D & E abortion procedure and the standard D & E abortion procedure depends on the intent and approach of the doctor in commencing the delivery and the degree of dilation sought to be achieved. See id. at 1621-22, 1632. As a result, the Virginia Act can be read to attach liability only when the doctor (1) knowingly commences an intact D & E abortion procedure and (2) performs the “deliberate act” to kill the fetus after it has emerged to the anatomical landmarks. As a doctor attempting to perform a standard D & E abortion does not know that he will ultimately perform an intact D & E abortion, he does not violate the Virginia Act.
Moreover, it can never be, under the Virginia Act, that a doctor who starts out intending to perform a standard D & E abortion is “knowingly performing] partial birth infanticide” because when he sets out to perform the exempted procedure, he is not “aware that it is practically certain that his conduct will cause [the proscribed] result.” Model Penal Code § 2.02(2)(b)(ii); see also Gonzales v. Carhart, 127 S.Ct. at 1631-32. Since, by definition, “partial birth infanticide” does not include the standard D & E procedure, a doctor setting out to perform a standard D & E could not possibly “know” at the outset that he is performing “partial birth infanticide,” even if the ultimate result is that such an intact D & E abortion occurs.
In response to this plain reading of the Virginia statute, the majority repeatedly *157 asserts, without statutory support, that the Virginia Act’s “intent requirement only attaches after the fetus has been delivered, to an anatomical landmark, so it does not distinguish between doctors who intend at the outset to perform standard D & Es and those who intend at the outset to perform intact D & Es.” Ante at 141; see also ante at 138. This observation, again, fails to recognize that the Virginia Act prohibits a doctor from “knoioingly ” performing a partial birth infanticide and explicitly exempts the standard D & E procedure under all circumstances. See Va. Code Ann. § 18.2-71.1(B) (stating that the term “partial birth infanticide” is not to include the standard D & E procedure “under any circumstances”). This is significant in terms of the intent required by the statute because the standard D & E procedure is defined by the intent of the doctor when he commences the procedure, a point the majority overlooks. As the Supreme Court made clear in Gonzales v. Carhart, a doctor performing a standard D & E has the intent at the outset to perform an abortion “in which the fetus would not be delivered to either of the ... anatomical landmarks.” Id. at 1631. Both the Supreme Court’s understanding of late-term abortion procedures and our record reveal that the difference in the procedures, to a large extent, turns on the steps a doctor takes at the outset of the procedure. Indeed, the Supreme Court stated that “an intact delivery is almost always a conscious choice rather than a happenstance.” Id. at 1632 (emphasis added). Because whether a doctor performs a standard D & E turns on the doctor’s intent at the outset, when a doctor has the intent at the start of the procedure “to perform a D & E in which the fetus would not be delivered to either of the Act’s anatomical landmarks,” id. at 1631, the doctor does not violate the statute. Thus, under the Virginia Act the mens rea attaches at the outset, contrary to the majority’s unsupported assertion.
In short, the Virginia Act is properly read to have the same scienter requirements as the Federal Act.
The majority also argues that the Virginia Act and Federal Act are different because, although the Federal Act and the Virginia Act both require a doctor to perform a “deliberate” or “overt” act to cause fetal demise after delivery to an anatomical landmark, the Federal Act requires that this act be distinct from completing delivery, while the Virginia Act, as the majority reads it, does not. The majority finds that the Federal Act’s requirement of an “overt act, other than completion of delivery” operates to exclude from criminal liability standard D & E abortions in which the fetus dies as a result of disarticulation or dismemberment that occurs during delivery, because the Federal Act requires an act, in addition to delivery, such as compressing the fetal skull, before liability can attach. But the majority believes that under the Virginia Act, a doctor is criminally liable when he completes delivery of the fetus after it has emerged substantially intact, if disarticulation or dismemberment (causing fetal demise) occurs accidentally during this process.
Again, the distinction made by the majority is not supported by the language of the Virginia Act. In the Virginia Act, a “ ‘partial birth infanticide’ means any deliberate act that (i) is intended to kill a human infant who has been bom alive.” Va.Code Ann. § 18.2-71.1(B) (emphasis added). The use of the present perfect tense indicates that the live birth, as defined in subsection (C) of the Virginia Act, must have taken place prior to the “deliberate act” which kills the fetus. Thus, the Virginia Act requires a specific overt act to kill the “human infant who has been bom alive,” and that act must be performed *158 after the infant has reached the anatomical landmark specified by the statute. Moreover, the Virginia Act has the exact same exception for “completion of delivery” as the Federal Act, despite the majority’s argument that it does not. The Virginia Act explicitly states that “[t]he term ‘partial birth infanticide’ shall not under any circumstances be construed to include ... completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.” Va.Code Ann. § 18.—71.1(B) (emphasis added).
The majority argues that “an act (such as disarticulation) that causes fetal demise can not occur during delivery for the [completion of delivery] exception to apply,” because the statute requires that the infant be living at the completion of delivery, ante at 141, and thus the exception would not protect the doctor when, in attempting to complete delivery, the fetus is ripped apart prior to being “completely delivered.” See Va.Code Ann. § 18.2-71.1(B)(iv). This, however, overlooks the Virginia Act’s requirement that the doctor perform a “deliberate act” that is “intended to kill a human infant.” Id. at § 18.2-71.1(B) (emphasis added). A doctor who intended to complete intact delivery did not “intend [ ] to kill a human infant,” even if, ultimately, the infant is removed from the woman in pieces and dies. The majority’s argument is again based on a misreading of the Virginia Act.
Accordingly, under the Virginia Act, a doctor who did not set out to perform an intact D & E abortion does not violate the Virginia Act even if the fetus, after emerging to an anatomical landmark, disarticu-lates, because (1) the standard D & E exception contained in the Virginia Act protects him, (2) the act of “completing delivery” is excluded from the definition of “partial birth infanticide,” and (3) he did not commit an overt act “intended to kill a human infant” after the “infant ... has been born alive.”
In ignoring explicit language and undertaking its course to find ambiguity in the Virginia Act so as to be able to strike it down, the majority violates established rules of statutory construction, such as the rule of lenity which requires that criminal statutes be construed in favor of the criminal defendant. See Ratzlaf v. United States, 510 U.S. 135, 148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95-96, 5 L.Ed. 37 (1820). In addition, the majority’s interpretation fails to accommodate the common law presumption of scienter— that criminal statutes are presumed to contain sufficient scienter requirements to separate innocent conduct from unlawful conduct. See Staples v. United States, 511 U.S. 600, 605-07, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); Morissette v. United States, 342 U.S. 246, 264-65, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Finally and most egregiously, the majority’s construction tramples the principle of constitutional avoidance — that if a statute can be fairly construed to avoid serious constitutional questions, it is appropriate to do so. “ ‘[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.’ ” Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (quoting Hooper v. California, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)); see also NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Crowell v. Benson, 285 U.S. 22, 46, 62-63, 52 S.Ct. 285, 76 L.Ed. 598 *159 (1932); Ashwander v. TVA, 297 U.S. 288, 346-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); accord United States v. X-Citement Video, Inc., 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (reading scienter element into statute because “[cjases ... suggest that a statute completely bereft of a scienter requirement ... would raise serious constitutional doubts”). Thus, the majority’s efforts to find ambiguity for the purpose of striking down a statute violate longstanding principles of statutory construction.
At bottom, there is simply no basis for finding a material distinction between the Virginia Act and the Federal Act. The Virginia Act contains both intent and overt act requirements, as does the Federal Act, and accordingly, the Supreme Court’s holding in Gonzales v. Carhart, finding the Federal Act constitutional, likewise renders the Virginia Act constitutional.
Ill
Apart from its argument that there is a material distinction between the Acts’ mens rea requirements, the majority still worries about the highly infrequent or even speculative circumstance where a doctor, who sets out to perform a standard D & E abortion, might accidentally deliver the fetus to an anatomical landmark. In the majority’s view, as that doctor completes the abortion by stabbing or squeezing the fetus’ skull, he subjects himself to the risk of criminal liability under the Virginia Act even though he set out to perform a standard D & E abortion. The majority claims that “[tjhe only way for a doctor to avoid this risk is to refrain from performing all standard D & E procedures,” and, as a result, it reasons that the Virginia Act imposes an undue burden upon a woman’s right to choose a previa-bility second trimester abortion. Ante at 146.
The same argument was made in Gonzales v. Carhart and rejected by the Supreme Court not only because the mens rea requirement would not be satisfied, see 127 S.Ct. at 1632, but also because the legislative evidence indicates that the majority’s hypothetical is entirely speculative. As the Court explained:
The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery.... And intact D & E is usually described as involving some manner of serial dilation.... Doctors who do not seek to obtain this serial dilation perform an intact D & E on far fewer occasions. See, e.g., Carhart [v. Ashcroft], 331 F.Supp.2d [805], 857-858 [D. Neb.2004] (“In order for intact removal to occur on a regular basis, Dr. Fitzhugh would have to dilate his patients with a second round of lamina-ria”). This evidence belies any claim that a standard D & E cannot be performed without intending or foreseeing an intact D & E.
Id. (relying on testimony of the plaintiff in that case, Dr. William Fitzhugh, who is also the plaintiff in this case).
Even if a doctor has an intellectual concern about this risk, he need not refrain from performing all D & E abortions in order to protect himself. The doctor who might conceivably face the risk of accidental intact delivery of a fetus to an anatomical landmark can always protect himself from criminal liability. Because of this, even without the protection of the double scienter elements contained in the Virginia Act, the Act must be found constitutional.
The Virginia Act contains a life exception that allows for the use of any proce *160 dure to save the life of the mother “so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant.” . Va.Code Ann. § 18.2-71.1(E). Accordingly, when by accident or fortuity a fetus emerges intact to an anatomical landmark, a doctor can always protect himself from criminal liability by attempting, from that point forward, to take reasonable steps to complete a live delivery. If he is unsuccessful, he nonetheless is protected by the language that he took medically reasonable steps to preserve the fetus. If, on the other hand, he is successful in completing the live delivery, he incurs no liability so long as he thereafter performs no deliberate act to kill the infant now born alive. Thus, even if the Virginia Act did not contain a knowledge element regarding commencement of the procedure or delivery, the doctor could still always protect himself from criminal liability if the procedure did not follow his intended course.
Dr. Fitzhugh argues that “requiring” a live birth in such circumstances would conflict with a doctor’s original purpose in commencing the abortion — to kill the fetus in the course of terminating the pregnancy. This, however, is not an unconstitutional result because the ability to choose abortion in any and all circumstances is not an unqualified right. It is well established that “the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child,” even taking into account the “recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State.” Gonzales v. Carhart, 127 S.Ct. at 1626 (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). “Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman’s exercise of the right to choose.” Casey, 505 U.S. at 877, 112 S.Ct. 2791 (opinion of O’Connor, Kennedy, and Souter, JJ.). The Virginia Act, like the Federal Act, “proscribes a method of abortion in which a fetus is killed just inches before completion of the birth process,” or indeed after a live delivery. Gonzales v. Carhart, 127 S.Ct. at 1632-33. Whether the fetus is intact inches before completion of the birth process by intent or by accident, the resulting harm of not prohibiting its destruction is the same: “Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life.” Partial-Birth Abortion Ban Act of 2003, Pub.L. No. 108-105, § 2(14)(N), 117 Stat. 1201, 1206 (congressional findings), quoted in Gonzales v. Carhart, 127 S.Ct. at 1633. The Supreme Court, in Gonzales v. Carhart, found that a State’s interest in protecting and ensuring respect for human life, and safeguarding the reputation of the medical profession, applies differently for standard D & E procedures and intact D & E procedures in which the fetus is destroyed after reaching anatomical landmarks. A State has a greater interest in prohibiting intact D & E abortions, and in protecting the life and health of a fetus that has partially entered this world, because of the “brutal and inhumane” nature of the procedure. See Gonzales v. Carhart, 127 S.Ct. at 1632-35. The Court explained:
Partial-birth abortion, as defined by the [Federal] Act, differs from a standard D & E because the former occurs when *161 the fetus is partially outside the mother to the point of one of the Act’s anatomical landmarks. It was reasonable for Congress to think that partial-birth abortion, more than standard D & E, “undermines the public’s perception of the appropriate role of a physician during the delivery process, and perverts a process during which life is brought into the world.”
Gonzales v. Carhart, 127 S.Ct. at 1634-35 (citing Partial-Birth Abortion Ban Act of 2003, Pub.L. No. 108-105, § 2(14)(K), 117 Stat. 1201, 1205 (congressional findings)).
Accordingly, even before the infant is delivered alive — when it is almost fully brought into the world — the Supreme Court has found the State’s interests in preserving the sanctity of life to be greater than in the case where the fetus is killed before it has substantially entered the world intact. Whether these distinctions make sense, or indeed whether both abortion methods are equally brutal, is not the question to contemplate in applying controlling law, as a standard D & E abortion has been judged permissible. But the Supreme Court has found that a State’s interest in the life of a human fetus is increased when that fetus is substantially expelled from the woman carrying it.
As a result, requiring a doctor — in situations that occur very rarely, if ever — to attempt to complete delivery and, if he so chooses, to allow the infant to expire on its own, is not an undue burden on a woman’s right to choose to have an abortion, nor does it subject any doctor to the possibility of unintentional and unchecked criminal liability. Perhaps a doctor cannot fully predict when an infant will emerge to an anatomical landmark intact, but the doctor can always control his actions in those exceedingly rare situations when this occurs and thus avoid criminal penalties in every case.
Moreover, if the woman’s life is in danger, the doctor can always take any steps necessary to save her. The Virginia Act explicitly states: “This section shall not prohibit the use by a physician of any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother.” Va.Code Ann. § 18.2-71.1(E). As Dr. Fitzhugh testified:
Q: So would you agree with me that if you had the — if you did not complete the delivery in the scenario you just described [where the head was lodged in the cervix] — you know, you said collapsing the skull or whatever other means — that the woman’s life would he at risk? Do you agree with that?
A: Yes sir.
Thus, the only situation in which a doctor might be faced with performing an “accidental” intact D & E is one in which the woman’s life is at risk and therefore in which the procedure is authorized, provided that the doctor first takes all reasonable steps, from that point on, to preserve the health and life of the fetus.
The majority argues that “[a]pplying the life exception in the manner suggested [by the Commonwealth] would render the Virginia Act largely meaningless by permitting the very procedure the Act was meant to prohibit: an intact D & E where, after a substantially intact delivery, the doctor must compress the fetal skull to remove the fetus.” See ante at 140. This argument, however, misses the mark. For several reasons, the life exception does not provide a loophole through which all intact D & E abortions can become legal. First, as discussed above, the Virginia Act contains the very same scienter requirement as does the Federal Act, requiring intent to perform an intact D & E abortion from the commencement of the procedure. Such intent could be proved in a criminal *162 trial through evidence regarding the actions of the doctor, such as the amount of dilation he sought, testimony of nurses and other witnesses present during the procedure, and information provided to the woman prior to the procedure, among, surely, many other things. And if the necessary intent is proven, then the life exception cannot prevent criminal liability from attaching, because the doctor performed the procedure with the required preexisting mens rea, not due to a reasonable medical judgment to prevent the mother’s death.
Second, even if the Virginia Act were read without the same mens rea requirements as the Federal Act, an intact D & E abortion still would not be permitted until the doctor makes reasonable efforts— whatever those encompass — to preserve the health and life of the fetus should the rare situation that the majority fears occur.
The majority asserts, in response, that the record yields but one conclusion as to the reasonable efforts a doctor can take from this point forward: “when the fetal skull becomes lodged in the cervix, the doctor must collapse the skull to complete the procedure.” Ante at 141. But with this statement the majority grossly mis-characterizes the record. Dr. Harlan Giles’ affidavit, for example, clearly states that if the fetal head were to become lodged in a woman’s cervix, “it is unsafe to crush the fetal skull with instrumentation,” and that “in such a situation, including those cases where the life of the woman is threatened, it is much safer to administer Terbutaline or nitroglycerine to the patient to facilitate immediate, additional cervical dilation.” (J.A. 288-29.) Not only is crushing the fetal skull not the only option, but in fact it may be the most dangerous one.
The majority further argues that under my reasoning (that even without a dual intent requirement a doctor can protect himself under the Virginia Act), “a doctor would be allowed to deliver (intentionally or unintentionally) a fetus until its skull becomes lodged; at this point both the Act’s prohibition and its life exception would begin to apply; and the life exception would immediately cancel out the prohibition, allowing the doctor to deliberately collapse the skull to complete the abortion.” Ante at 140. Tellingly, the majority’s argument here acknowledges that a doctor can, at least to some degree, control what happens from the inception of the procedure — -if he could not, there would be no difference between a doctor who “intentionally” delivers a fetus to an anatomical landmark and one who does so “unintentionally.” Setting that aside, the requirement that a doctor take steps to preserve the life of the infant means that the Virginia Act does not allow a doctor to perform this intentional intact D & E, as the majority fears, because the doctor must— from the point that the fetal head becomes lodged in the cervix — make all efforts to save the life of the infant (while, of course, also making all efforts to save the life of the woman). A doctor would not do this when performing the criminalized intentional intact D & E. It may be that this fetus ultimately dies — but it is consistent with the Supreme Court’s expressed views of the sanctity of life that, from the point the fetus has emerged into the world largely intact, we must respect it. See Gonzales v. Carhart, 127 S.Ct. at 1634-35 (finding it a reasonable viewpoint that an intact D & E, which “occurs when the fetus is partially outside the mother to the point of one of the Act’s anatomical landmarks,” more than the standard D & E, “perverts a process during which life is brought into the world”) (internal quotation marks and citation omitted).
*163 In a reaching attempt to further confuse the statute’s reader, the majority appears troubled that the Virginia Act’s life exception does not protect the doctor when the fetus accidentally disarticulates while he attempts to complete delivery, and that the completion of delivery exception does not apply when the doctor faced with an accidental intact D & E compresses the fetal skull lodged in the woman’s cervix. But the majority’s distinction is again illusory. As I have shown, when a fetus accidentally disarticulates while a doctor attempts to complete delivery, the doctor is protected by the exception for completion of delivery. Thus, he does not need to be protected by the life exception. And if the fetal skull becomes lodged in the cervix and the doctor has made all efforts to complete a live birth, the doctor can do what he needs to remove the fetus in order to save the life of the woman; he has protection under the life exception and does not need protection under the completion of delivery exception. Again, the majority’s selective reading of the statute is glaring.
The majority worries still that the completion of delivery exception applies only when the doctor completes delivery and severs the umbilical cord, and therefore, that if the umbilical cord accidentally is severed in the process of delivery, the doctor becomes automatically criminally liable. The complete absence of support in the record for the contention that the doctor is likely to unintentionally sever the umbilical cord when completing delivery reveals, once again, the problem with the majority’s attempt to strike down the statute based on a hypothetical factual record- — here, based on a scenario created entirely by the majority’s imagination. Moreover, a doctor who attempts to complete delivery, even if the fetus accidentally disarticulates and the umbilical cord is accidentally severed, would still not violate the statute because he would not have taken a deliberate act that was “intended to kill a human infant.” Va.Code Ann. § 18.2-71.1(B).
In short, the majority’s belief — that “[t]he only way for a doctor to avoid [the risk of criminal liability when a doctor sets out to perform a standard D & E and accidentally delivers the fetus to an anatomical landmark] is to refrain from performing all standard D & E procedures,” see ante at 146 — is demonstrably wrong. And the majority’s assertion that “[t]he express terms of the [Virginia] Act are susceptible to only one construction: that doctors performing standard D & Es face liability when the fetus emerges substantially intact and completing extraction causes fetal demise,” ante at 144, is simply a false statement. It fails to recognize the explicit language of the Virginia Act that excludes standard D & E abortions from the statute’s coverage altogether and that the statute imposes criminal punishment only for the “knowing ” performance of a partial birth infanticide and the “deliberate act ... intended to kill a human infant who has been born alive.” Va.Code Ann. § 18.2-71.1(B). In basing its holding that the Virginia Act is unconstitutional on such demonstrably wrong premises, the majority flaunts “[t]he elementary rule ... that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.” Gonzales v. Carhart, 127 S.Ct. at 1631 (internal quotation marks omitted).
TV
Virginia contends, in light of Gonzales v. Carhart, that the district court erred in the first instance by hearing the facial attack on the Virginia Act, arguing that an as-applied challenge is instead the appropriate mechanism for raising the concerns that Dr. Fitzhugh has about the Virginia *164 Act’s constitutionality. The Commonwealth argues alternatively that if we entertain the facial challenge, regardless of which standard is adopted for conducting a facial challenge, Dr. Fitzhugh cannot satisfy it.
The majority dismisses the Commonwealth’s argument that a facial challenge is not appropriate here, finding that Gonzales v. Carhart did not foreclose all facial challenges alleging overbreadth in statutes regulating abortion, but only a facial challenge based on the Federal Act’s lack of a health exception. Such a narrow take on the Supreme Court’s analysis, however, is rejected by the Court’s explicit language. In any event, I agree with the Commonwealth that no matter what standard for conducting a facial challenge is applied— whether it be the “no-set-of-eircum-stanees” standard of Salerno, 481 U.S. at 745, 107 S.Ct. 2095, or the “large-fraetion-of-the cases” standard discussed in Casey, 505 U.S. at 895, 112 S.Ct. 2791—Dr. Fitzhugh cannot satisfy either standard with the hypothetical factual circumstances that he posits.
In Gonzales v. Carhart, the Supreme Court noted that whatever standard for conducting a facial challenge should apply, the plaintiff would, regardless, have to satisfy at least the more relaxed standard of Casey, by “demonstrating] that the Act would be unconstitutional in a large fraction of relevant cases.” 127 S.Ct. at 1639 (emphasis added). The Court thus limited its scope of facial review to provisions governing “all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications.” Id. As the Court explained:
It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.
Id. (internal quotation marks omitted). The Court made clear that the judicial preference is for “[a]s-applied challenges [as they] are the basic building blocks of constitutional adjudication.” Id. (internal quotation marks omitted) (first alteration in original). This preference was only recently reiterated with yet greater force when the Court admonished against basing a facial challenge on “hypothetical” or “imaginary” cases. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. -, 128 S.Ct. 1184, 1190-91, 170 L.Ed.2d 151 (2008) (observing also that facial challenges are “disfavored”).
Despite these prescriptions, the majority proceeds to strike down the Virginia Act based on only “potential situations that might develop.” See Gonzales v. Carhart, 127 S.Ct. at 1639 (finding such an approach to be inappropriate). This is especially egregious here, where unconstitutionality can be found only with respect to a hypothetical case that, according to Dr. Fitzhugh, only very rarely occurs and, according to the Commonwealth’s witnesses, never occurs.[2]
*165 As the facial challenge in this case is built on a hypothetical case that is not contemplated by the Act and occurs only rarely, it should never have been heard. The majority invalidates the Virginia Act solely because it believes that in a potential case — a standard D & E abortion that accidentally presents the opportunity for prohibited conduct — the Virginia Act might violate the Constitution.
The majority’s opinion illustrates well the problem with facial challenges. Indeed, its selective consideration of an entirely hypothetical case is its most glaring fallacy. It rests its principal arguments on the hypothetical possibility that a doctor, intending to perform a standard D & E, accidentally delivers the fetus intact until the fetus’ skull becomes lodged during a breech delivery, concededly a very rare event. At the same time, it rejects an argument based on what it calls the rare event that a fetus could be delivered intact, stating that Dr. Fitzhugh does not challenge the Act’s constitutionality “when (in a D & E) a fetus is entirely intact after complete removal.” Ante at 144. This cherry-picking highlights the problem for facial challenges in a context where the record has no medical case at issue. We are not free to speculate as to what might happen in one particular circumstance in order to craft a reason to strike down the statute.
In addition, the majority specifically ignores our circuit standard for conducting a facial challenge. It states: “We are not bound to use the Salerno standard [requiring plaintiffs to satisfy the “no set of circumstances” burden for overbreadth challenges], and our reason is simple: the Supreme Court has not adopted this standard in the abortion context.” Ante at 147. Yet the majority fails to recognize three cases in which we applied the Salerno standard with respect to our review of abortion statutes. See Greenville Women’s Clinic v. Commiss’r, 317 F.3d 357, 362 (4th Cir.2002); Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 164-65 (4th Cir.2000); Manning v. Hunt, 119 F.3d 254, 268-69 (4th Cir.1997). In Greenville Women’s Clinic v. Commissioner, we reviewed a state regulation for licensing abortion clinics that the plaintiffs had contended placed an “undue burden” on a woman’s decision whether to seek an abortion, and we stated, “We begin by emphasizing, as we did in Bryant I, that the challenge to Regulation 61-12 is a facial one and therefore ‘the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.’ ” 317 F.3d at 362 (quoting Salerno, 481 U.S. at 745, 107 S.Ct. 2095).
It is well established in our circuit that one panel cannot overrule the decision of another. See McMellon v. United States, 387 F.3d 329, 332 (4th Cir.2004) (“A number of cases from this court have stated the basic principle that one panel cannot overrule a decision issued by another panel”). Yet, by ignoring panel decisions that establish Salerno as the governing standard in our circuit for facial challenges of abortion regulations, the majority purports to do just that.
Regardless of which standard is applied, however — whether from Salerno or from Casey — the Virginia Act survives even the most lenient standard for a facial challenge. Under the Casey standard, Dr. Fitzhugh would have to show that the Virginia Act would be unconstitutional “in *166 a large fraction of the cases in which [the statute] is relevant.” 505 U.S. at 895, 112 S.Ct. 2791. Yet, by his own estimation, the accidental partial birth infanticide would occur rarely. Indeed, the Supreme Court stated that the evidence “belies” such a circumstance:
The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. And intact D & E is usually described as involving some manner of serial dilation. Doctors who do not seek to obtain this serial dilation perform an intact D & E on far fewer occasions. This evidence belies any claim that a standard D & E cannot be performed without intending or foreseeing an intact D & E.
Gonzales v. Carhart, 127 S.Ct. at 1632 (internal citations omitted).
The medical evidence in this case follows that presented in Gonzales v. Carhart, where Dr. Fitzhugh was also a plaintiff, and here too it fails to support the notion that delivery beyond the Act’s anatomical landmarks is ever both (1) accidental and (2) unavoidable. At best, it can be said that it is very rare for the fetal head to become lodged in the woman’s cervix during a standard D & E. Moreover, one of the plaintiffs’ medical experts, Dr. Charles DeProsse, stated that though “several factors determine how the procedure will progress,” “a skilled physician will adapt his or her technique in light of the individual patient’s needs.” Dr. De-Prosse’s uncontradicted affidavit suggested that when the fetus appears in the cervix head first and passes the anatomical landmarks, there is never a need to perform an overt act to kill it, as it can simply be removed from the woman intact. Moreover, in the rare event that the fetus is presented in breech position and its skull becomes lodged in the cervix, the doctor has options short of performing an overt act to kill the fetus, thereby avoiding liability under the Act. The doctor can wait for further dilation; he can administer a drug to dilate the cervix to a greater extent; or he can compress, but not crush, the head of the fetus. While these methods may not be universally agreed to, “[m]edical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts.” Gonzales v. Carhart, 127 S.Ct. at 1637.
As a result, there is no evidence in the summary judgment record suggesting either the existence or inevitability of the speculated “accidental” intact D & E abortion. To the extent that such a circumstance might arise in a rare case, the doctor has adequate alternatives so as to preclude a finding on a facial challenge that the statute is unconstitutional in “a large fraction” of the cases to which it is relevant. Even under the majority’s rare hypothetical, the Virginia Act would be constitutional. We should thus reject the district court’s facial review of the Virginia Act.
V
Because the majority concludes that the Virginia Act is facially unconstitutional, it does not address to any significant extent Virginia’s contention that the district court stacked the factual deck against the Commonwealth by improperly excluding from consideration important evidence that would have supported even further the constitutionality of the statute and that placed any factfinding by the district court deeper in doubt. In particular, Virginia contends that the district court erred in (1) striking the testimony of Virginia’s expert, *167 Dr. Harlan Giles; (2) striking portions of the testimony of Virginia’s other expert, Dr. John Seeds; and (3) excluding testimony given before the United States House of Representatives Committee on the Judiciary during hearings on the Federal Act.
In my dissent in the original opinion in this case, I addressed the evidentiary issues in some detail. See Hicks II, 409 F.3d at 642-45 (Niemeyer, J., dissenting). Here, I rest on my earlier analysis and only briefly reiterate why the district court’s evidentiary rulings were in error.
Virginia proffered the testimony of Dr. Harlan Giles, an obstetrician and gynecologist specializing in maternal and fetal medicine, to support several parts of its defense, including the proposition that equally safe alternatives to any procedure banned by the statute exist. The district court struck all of Dr. Giles’ testimony, finding it to be “unreliable because it [was] inconsistent and incoherent.” Hicks I, 301 F.Supp.2d at 510. In particular, the district court found that Dr. Giles’ testimony on particular points contradicted testimony that he had given in a prior lawsuit. The court relied primarily on this inconsistency to disqualify Dr. Giles.
It is of course well established that under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), a district court has an obligation to “ensure that any and all scientific testimony ... is not only relevant, but reliable.” Daubert, 509 U.S. at 589, 113 S.Ct. 2786. Although the Supreme Court in Kumho Tire considered the inconsistency of an expert’s testimony as a factor in not certifying the expert, the Court’s overriding concern in that case was the unreliability of the method used by the expert. Kumho Tire, 526 U.S. at 157, 119 S.Ct. 1167. In contrast, here, the apparent inconsistencies in Dr. Giles’ testimony, which constituted the district court’s main reason for its exclusion, were inconsistencies between testimony given by Dr. Giles in this case and the testimony he gave in an earlier case, and the district court did not explore the reasons for any differences.
The district court also supported its decision to exclude Dr. Giles’ testimony with its conclusion that one method Dr. Giles advocated for completing an abortion in which the fetus’ head became lodged in the woman’s cervix fell below the accepted standard of care. To reach this conclusion, however, the district court ignored the testimony of Dr. Fitzhugh’s own expert, who indicated that Dr. Giles’ method would not in fact be a breach of the standard of care.
Finally, the district court supported its decision to strike the testimony of Dr. Giles by noting that Dr. Giles could not point to any medical literature to support his theory that cervical muscle relaxants could be used to dislodge a fetal head that had become lodged during a standard D & E procedure. Disqualifying Dr. Giles on this basis is particularly troubling because Dr. Fitzhugh’s experts similarly failed to support several of their opinions with documented medical authority, yet the court chose to rely on them. The court’s rejection of Dr. Giles’ testimony for that reason created a double standard and was an abuse of discretion.
The district court also struck portions of the testimony of Virginia’s other witness, Dr. John Seeds, based on a finding that Dr. Seeds was an expert on neither abortions nor D & E abortion procedures. The district court concluded solely from the fact that Dr. Seeds did not perform abortions that his testimony in this matter would be unreliable. But as an OBGYN expert in maternal/fetal medicine, Dr. *168 Seeds knew more about the female anatomy, pregnancy, and birth than the average juror. In fact, Dr. Seeds, as an expert in maternal/fetal medicine, might actually have been more qualified to render an opinion than Dr. Fitzhugh’s experts, neither of whom had expertise in maternal/fetal medicine. As a maternal/fetal medicine specialist, Dr. Seeds had extensive training in the management of high-risk pregnancies, which made him qualified to speak to possible complications occurring during pregnancy that could necessitate the types of procedures banned by the Virginia Act.
The district court and the majority would seem to have us exclude all testimony of doctors who choose not to perform intact D & E abortions, accepting as valid only the opinions of those who do choose to perform these abortions. But such an approach is nonsensical. Doctors who believe that an intact D & E is never medically necessary will, necessarily, never perform the procedure. By excluding the testimony of doctors who fully understand maternal/fetal medicine and the female anatomy, and as a result never perform an intact D & E, a record in this type of case can never contain evidence that the intact D & E abortion procedure is not medically necessary, even if this is true.
The exclusion of Dr. Seeds’ testimony is so highly irregular that it is difficult for me to conceive of the motive for the district court’s ruling. In any event, I believe it clear that the district court abused its discretion in excluding Dr. Seeds’ testimony.
Finally, the district court excluded parts of the Congressional Record for the Federal Act as evidence that such a ban would not endanger a woman’s health. This exclusion covered all parts of the Congressional Record, including the House Committee Report and the congressional testimony of Dr. Mark Neerhof, an OBGYN professor at Northwestern University Medical School. Specifically, the district court found that the report was “political” and “untrustworthy” and that Dr. Neerhof s statement was hearsay.
Although it was within the district court’s discretion to conclude that the Congressional Report was unreliable, the district court again applied a double standard to reach such a conclusion. In particular, the court repeatedly relied on hearsay statements made by the American College of Obstetricians and Gynecologists, which were presented by Dr. Fitzhugh. I can see no relevant difference between Dr. Neerhof s testimony before Congress and the hearsay statements made by the American College of Obstetricians and Gynecologists. If the district court chose to exercise its discretion to exclude such testimony, then it should have done so across the board. If it chose to include the testimony as legislative facts, then it should have done so uniformly. Its single-sided ruling against Virginia, however, is, I submit, unexplainable and constituted an abuse of discretion.
VI
Because the Virginia Act criminalizes precisely the same conduct as does the statute upheld in Gonzales v. Carhart, I would now also uphold the Virginia Act. Once again, the choice made by the majority to strike down Virginia’s partial birth infanticide statute is not compelled by the Constitution nor by any Supreme Court case. Indeed, after reading the majority’s opinion, one is struck by the extensive efforts the opinion makes to conceive of a remote hypothetical factual circumstance that might exemplify its thesis that the Virginia Act prohibits more than is prohibited by the Federal Act, which the Supreme Court upheld in Gon *169 zales v. Carhart. The majority’s selective use of statutory language and its rationalizations represent nothing less than a strong judicial will to overturn what the Virginia legislature has enacted for the benefit of Virginia’s citizens and what, in materially undistinguishable terms, the Supreme Court has upheld as constitutional. Cf. Gonzales v. Carhart, 127 S.Ct. at 1631 (directing that “every reasonable construction must be resorted to, in order to save a statute from unconstitutionality”) (internal quotation marks omitted).
Because Gonzales v. Carhart requires us to uphold the constitutionality of the Virginia Act, I vote to reverse the judgment of the district court.

. The majority worries that because the Virginia Act excludes “the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother,” the exception applies only to standard D & E abortions in which the doctor is able to complete the procedure as intended, dismembering the fetus prior to its removal from the woman.
But the Virginia Act's statement "involving the dismemberment of the fetus prior to removal from the body of the mother” serves only as a descriptive term, explaining that the exclusion applies to the standard D & E and not to the intact D & E. In fact, both the majority and the Supreme Court describe the conduct prohibited by the Federal Act with the same language, stating that the Federal Act "prohibits a doctor from intentionally performing an intact D & E,” but "does not prohibit the [standard] D & E procedure in which the fetus is removed in parts,” Gonzales v. Carhart, 127 S.Ct. at 1629 (emphasis added); ante at 135, even though it is obvious that both the Supreme Court and the majority read the Federal Act not to criminalize the accidental intact D & E abortion, if such occurs.

. Dr. Seeds stated in his affidavit that "[e]ven if the health concerns raised by ... Dr. Fitzhugh were medically valid, there is no clinical scenario I can imagine where a physician would have to resort to a procedure that violated Virginia Code § 18.2-71.1.” (J.A. 286). Dr. Giles stated in his affidavit that "it is very rare for the fetal head to become lodged in the cervical os during a D & E,” and that if this occurs, the doctor has a number of options, such as administering Terbuta-line or nitroglycerine to the patient to facilitate immediate, additional cervical dilation. The doctor would never face, as the majority's *165 hypothetical case requires, the sole option of crushing the fetal skull. In fact, such an act would be "unsafe,” creating "an undue risk of perforation or damage to the uterus and cervix.” (J.A. 288-89).